STATE of Missouri, Respondent,

v.

Willie SIMMONS, Appellant.

No. 77368.

Supreme Court of Missouri,
En Banc.

Sept. 30, 1997.

As Modified on Denial of Rehearing
Nov. 25, 1997.

Janet M. Thompson, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for Respondent.

LIMBAUGH, Judge.

A jury convicted Willie Simmons of the first degree murder of Cheri Johnson and sentenced him to death. The postconviction court overruled Simmons' Rule 29.15 motion. This Court has jurisdiction. Mo. Const. art. V, sec. 3. We affirm the judgments.

## I. FACTS

Simmons was charged with the murder of Cheri Johnson in the first count of a two-count indictment. The second count charged Simmons with the murder of Leonora McClendon. Simmons was originally tried for both counts in the same proceeding and was found guilty on both counts. This Court overturned those convictions on the basis that the two murder charges should not have been tried together. *State v. Simmons*, 815 S.W.2d 426 (Mo. banc 1991). On remand, Simmons was first tried for the murder of Cheri Johnson and once again found guilty. He was then tried and convicted for the murder of Leonora McClendon.

The evidence at trial, which we review in the light most favorable to the verdict, *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995), reveals the following:

On the evening of November 30, 1987, neighbors heard screams and thumping noises emanating from Cheri Johnson's Plaza Square apartment. A building security guard investigated the noises. He knocked on Johnson's apartment door several times before a male voice said that everything was okay and that the woman was sleeping. The security guard asked to be let inside the apartment, but there was no further response. Eventually, the security guard departed.

The next day, Johnson did not show up for work. Upon investigation, the police found her dead, beaten in the head and strangled with a distinctively colored necktie. During an examination of the apartment, the police discovered a carnation wrapped in purple paper. They traced this carnation to a flower shop in St. Louis Centre, where the employees informed them that the purple paper was unique to their shop, and that the previous day the only person who had bought a carnation was a man wearing a tie matching the one around Johnson's neck. One of the employees thought that the man worked at Walgreen's. The police inquired at Walgreen's and found that although he no longer worked there, the man's name was Willie Simmons.

The police arranged for Simmons to come in for an interview in early December, but he did not appear. They then began searching for him. On January 3, 1988, he came to them, showing up at the homicide office. He gave increasingly incriminating responses to police questioning: at first asserting that he had met Johnson but had never been to her apartment; next, saying that they had had a relationship, that she had given him a key to her apartment, and that he kept some items of clothing there, including the distinctive tie; then, saying that on November 30, he had gone to Johnson's apartment to take her the carnation and other items, but had left these items at her front door and had not gone in the apartment; finally, saying that he had gone inside the apartment that day. He could not, however, produce for police the alleged key to Johnson's apartment.

The police then arrested Simmons for Johnson's murder. They seized his billfold and recovered, among other items, three pawn tickets and claim checks for photographs being developed. Two of the pawn tickets were for jewelry belonging to Johnson and the other was for a watch owned by McClendon. Simmons first explained the presence of these pawn tickets by saying that Johnson had given him the jewelry to pawn to raise money to fix his automobile, then changed his story and said that he had stolen the jewelry from Johnson's apartment after finding her dead on the floor. The autopsy of Johnson revealed scratch marks on her fingers consistent with forcible removal of jewelry. The photographs that police recovered from the claim checks included numerous images of Simmons, including one of him wearing the distinctive tie found around Johnson's neck, and one of him at the flower shop where he had bought the carnation.

## II. ALLEGATIONS OF TRIAL COURT ERROR

### A. DISQUALIFICATION OF JUDGE

Simmons asserts that the trial court erred in overruling his motion to remand for a hearing on the State's motion to disqualify the judge originally assigned to Simmons' cases. The State's motion to disqualify was sustained on November 23, 1993, and the cases were transferred to a different judge. Simmons' motion for remand, filed January 6, 1994, alleged that the disqualification of Judge Peek was improper in that the State had already received an automatic change of judge under Rule 32.07 on January 6, 1992.

In ruling on the motion to remand for a hearing, Judge Dierker construed the State's April 23 motion as a motion to disqualify for cause. There is nothing in the record to indicate that this interpretation was incorrect. Under Rule 32.10, the State could properly move for a disqualification for cause, even after previously receiving an automatic change of judge. Simmons does not contend that Judge Peek improperly assessed the impropriety of his continued involvement in the cases, and having apparently determined that he was biased, Judge Peek properly removed himself from Simmons' cases. Under these facts, Judge Dierker had no reason to remand for a hearing on the State's motion for disqualification of Judge Peek; thus, the trial court committed no error in overruling Simmons' motion to remand for a hearing. Furthermore, because the disqualification was proper, Simmons' related claims of 1) ineffective assistance of counsel for failing to petition for a writ of prohibition to prevent Judge Dierker from hearing the cases, and 2) prosecutorial misconduct for filing a second motion for change of judge, are both necessarily invalid.

## B. MOTION TO SUPPRESS

■ Simmons next argues that the trial court erred in denying his pretrial motion to suppress evidence obtained by the police through two of the pawn tickets and the CPI Photo receipts found in his wallet and in overruling his objection to the admission of this evidence at trial. We review the denial of a motion to suppress to determine whether sufficient evidence exists to support the trial court's decision. *State v. Wise,* 879 S.W.2d 494, 503 (Mo. banc 1994).

■ During the investigation, the police learned that the pawn tickets were for jewelry owned by Cheri Johnson, and they used the photo receipts to recover photographs from the CPI lab. Simmons contends that the police violated his Fourth Amendment right to be free from unreasonable searches and seizures both when they seized the pawn tickets and photo receipts and later when they seized the jewelry and photographs. The seizure of the pawn tickets and photo receipts was part of a legitimate inventory search, despite Simmons' assertion that the police were merely rummaging through his wallet. To succeed on his challenge of the seizure of the jewelry and photographs, Simmons has the burden of showing standing through an expectation of privacy in the items seized. *Id.* at 504. Nevertheless, Simmons does not even attempt to identify any privacy interest in the evidence that was obtained from either the pawn tickets or the CPI receipts. Obviously, Simmons had no expectation of privacy in the premises of the photo development business; but more importantly, he relinquished any right of privacy he had in the photographs or negatives themselves by giving them to the developer. *See State v. Urban,* 798 S.W.2d 507, 514–15 (Mo.App.1990). In doing so, he assumed the risk that the photographs might be shown to others, even the authorities. *Id.* at 515. As to the pawn tickets, we are at a total loss to discern any expectation of privacy on the part of Simmons in stolen jewelry located in a public pawn shop. In sum, the trial court properly denied the motion to suppress and allowed admission of the evidence at trial.

## C. VOIR DIRE

■ Simmons asserts that the prosecutor made several improper, objectionable statements during voir dire. However, Simmons objected to only one of these statements, when the prosecutor said that the jurors would make a punishment "recommendation" to the judge. Citing *Caldwell v. Mississippi,* 472 U.S. 320, 328–29, 105 S.Ct. 2633, 2639–40, 86 L.Ed.2d 231 (1985), he suggests that the comment "impermissibly led the jury to believe the responsibility for determining the appropriateness of [the] sentence lay elsewhere." This Court, however, has repeatedly rejected this same argument. *Antwine v. State,* 791 S.W.2d 403, 410 (Mo. banc 1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991); *State v. Roberts,* 709 S.W.2d 857, 868–69 (Mo. banc 1986), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986). The point has no merit.

We need not consider the merits of the remainder of the allegedly improper comments. Having reviewed the entire record, we find that no manifest injustice or miscarriage of justice resulted from those comments even if they were improper and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20.

■ One venireperson, an African–American woman, was removed from the jury by the prosecutor's peremptory strike. Simmons alleges that this removal was race-based, in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). If the defendant wishes to challenge a prosecutor's peremptory strike, he must first raise the challenge by identifying the cognizable racial group to which the stricken venireperson belongs. The trial court will then require the State to proffer a reasonably specific and race-neutral reason for striking the venireperson. The defendant then has the opportunity to show that the proffered race-neutral reasons are merely pretextual and that the strike is actually race-based. *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc 1992).

■ After Simmons challenged the prosecutor's strike of the particular venireperson, the prosecutor offered several race-

neutral reasons for striking her: she was perceptibly weak on the death penalty, she was agitated or perturbed to be at voir dire, and she was an employee of the post office, an occupation with which the prosecutor claimed he had had poor results on juries. After Simmons argued that these reasons were merely pretextual, the trial court denied his challenge. This decision will be overturned only if it is clearly erroneous. *State v. Antwine,* 743 S.W.2d at 66. The reasons put forth by the prosecutor are sufficiently race-neutral and nonpretextual to allow us to conclude that the trial court did not clearly err in denying Simmons' *Batson* challenge. This point is rejected.

## D. GUILT PHASE

### 1. Prosecutor's Comments

Simmons raises numerous claims of error regarding allegedly improper statements in the prosecutor's opening and closing guilt phase arguments. None of these errors were preserved for appellate review, however, either because they were not objected to or because they were not raised in Simmons' motion for new trial. We need not pass on the merits of these allegedly improper statements. After reviewing the entire record, we find that no manifest injustice or miscarriage of justice resulted from those statements even if they were improper and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20.

### 2. Testimony

█ Next, Simmons cites numerous excerpts from witness testimony to which his counsel made no objection that he claims constitute plain error of the trial court for failure to declare a mistrial *sua sponte.* Again, we need not pass on the merits of these alleged errors. Having reviewed the entire record, we find no manifest injustice or miscarriage of justice and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20. Simmons has, however, preserved other complaints about witness testimony for our direct appellate review, and we review these claims for trial court abuse of discretion. *See State v. Griffin,* 756 S.W.2d 475, 483 (Mo. banc 1988).

█ First, Simmons alleges a violation of his Fifth Amendment right to silence when a detective testified that Simmons did not appear for a December 1987 interview even though Simmons "knew we wanted to talk to him." The trial court properly overruled Simmons' objection to the detective's testimony. We disagree that the detective's testimony about Simmons' failure to appear for an interview was a comment on Simmons' right to remain silent. Regardless, Simmons was not in custody at that time, and evidence of a defendant's silence is only disallowed if the defendant was in custody. *State v. Kinder,* 942 S.W.2d 313, 326 (Mo. banc 1996).

█ Simmons also complains of a detective's testimony, admitted over an hearsay objection, that employees of the St. Louis Centre flower shop and Walgreen's gave him information concerning Simmons' identity and description. This information was not offered for the truth of the matter asserted— that Simmons had purchased flowers and had been an employee at Walgreen's—but was admissible, rather, to explain the detective's subsequent actions in pursuing Simmons. Therefore, it was not hearsay. *See State v. Murray,* 744 S.W.2d 762, 773 (Mo. banc 1988).

█ This same detective also testified that he found pawn tickets from two different pawn shops in Simmons' wallet. Simmons, believing that this testimony amounted to impermissible evidence of "other crimes," moved for a mistrial, and the court denied this motion. Unless the testimony objected to consists of clear evidence of another crime, there is no trial court abuse of discretion in denying a mistrial. *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc 1989). Here, neither the general act of having pawn tickets nor the specific act of having pawn tickets from two different locations is a crime or intrinsic evidence of a crime. The fact that two pawn tickets were tied to this crime, leading police to recover some of Johnson's jewelry that Simmons had pawned, does not make the third pawn ticket from a different pawn shop clear evidence of another crime.

Another detective testified, in response to the prosecutor's questioning, that Simmons told the detective he did not appear for the December 1987 interview because Simmons "thought he was wanted ... for another incident." The court again denied Simmons' "other crimes"-based mistrial motion, and Simmons declined to accept the court's offer to instruct the jury to disregard the comment. After a brief conference between counsel and the court, the prosecutor resumed questioning without further reference to the comment. While this statement might have been objectionable, its isolated and vague nature does not sufficiently constitute clear evidence of another crime to allow us to conclude that the trial court abused its discretion in refusing a mistrial. Simmons' testimonial points are denied.

### 3. Physical Evidence

Simmons contends that several items of physical evidence, chiefly photographs, were improperly admitted at the guilt phase. The admission of photographs is within the broad discretion of the trial court. *State v. Isa*, 850 S.W.2d 876, 890 (Mo. banc 1993). Photographs that tend to corroborate witnesses' testimony, help the jury understand testimony, or prove an element in the case are admissible. *Id.*

Exhibits 127–130 depict Johnson's body lying on the autopsy table before the autopsy had begun. Simmons argues that these photographs were more prejudicial than probative. Compared to other murder victim photographs, however, these are not particularly gruesome. Three of them are of the head and upper torso only. They were introduced during the pathologist's testimony and, contrary to Simmons' suggestion, were used to explain testimony regarding Johnson's head wounds and other injuries. Explanation of a pathologist's testimony is an acceptable reason to introduce autopsy photographs. *See Isa*, 850 S.W.2d at 890–91; *State v. Mease*, 842 S.W.2d 98, 108–09 (Mo. banc 1992).

Simmons also avers that the trial court erred in admitting a photograph obtained from CPI Photo because it was irrelevant and highly prejudicial. This photograph was one of several that showed Simmons wearing the tie used to strangle Johnson, showed him at the flower shop where he bought the telltale carnation, and showed other people and items proving that the photographs are Simmons'. The particular photograph of which Simmons now complains depicts him appearing to joke around with a young woman. Both individuals are smiling and/or laughing, Simmons' left arm is around the woman, and his right arm/hand is on her neck. Simmons misconstrues this photograph as purporting to show that Simmons is a "lady-killer." The photograph appears entirely light-hearted and does nothing of the kind. The point is denied.

Next, Simmons complains of the admission of a mug shot of Simmons from a prior arrest. One detective used this photograph to display when canvassing for Simmons. The photograph was admitted during the detective's testimony recounting how he searched for Simmons. Only now does Simmons contend that the mug shot is evidence of other crimes, and his objection and his motion for new trial complained only of an improper foundation for admitting the photograph. Therefore, we review only for plain error. Rule 30.20; *State v. Ervin*, 835 S.W.2d 905, 919 (Mo.banc 1992).

All dates and other identifying marks on the photograph were redacted. The only thing identifying the photograph as a "mug shot" is its nature—showing Simmons from the side in the first shot, then looking straight into the camera in the adjoining second shot. Only an unusually attentive and deductive juror would conclude that since the detective was canvassing with this photograph before Simmons' arrest for Johnson's murder, and since the photograph appears to be a mug shot, it must be a mug shot from another crime of Simmons. This deductive process does not constitute clear evidence of another crime, *Hornbuckle*, 769 S.W.2d at 96. We need not pass on the merits of the alleged error. After reviewing the entire record, we find that no manifest injustice or miscarriage of justice resulted from admission of the mug shot even if the mug shot was improperly admitted and,

therefore, we have no discretion to grant plain error relief. *See* Rule 30.20.

### 4. Instructional Error

■ Simmons also requests plain error review of the use of Instruction 5 during the guilt phase. Simmons does not complain of the content of the instruction but, rather, its physical nature. The document instructs the jurors that if they find the proper elements, "then you will find the defendant guilty under Count I of murder in the first degree." The words "under Count I" were scratched through yet still clearly legible, and apparently refer to the State's case against Simmons for the murder of Leonora McClendon. The jurors had absolutely no knowledge of the McClendon case, however, and it takes a leap of the imagination to believe that a juror would conclude from Instruction 5 that there must be some other first degree murder charge against Simmons. The document itself does not easily lend itself to this construction. We need not pass on the merits of the alleged error. Having reviewed the entire record, we find that no manifest injustice or miscarriage of justice resulted from the use of this instruction even if it was improperly crafted and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20.

### 5. Sufficiency of the Evidence

■ Simmons contends that the evidence was insufficient to prove that he killed Johnson "knowingly . . . after deliberation," as required for first degree murder. Sec. 565.020.1, RSMo 1986. When reviewing for sufficiency, we view the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to the State and disregard all evidence and inferences to the contrary. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). Deliberation occurs when the perpetrator acts with a cool and deliberate state of mind. *State v. Turner*, 623 S.W.2d 4, 7 (Mo. banc 1981). This mental state is rarely provable directly and is usually shown circumstantially. *Id.* The actual evidence in this case shows that Johnson was hit more than once in the head with a heavy object, that she was strangled with a necktie, and that such strangulation would take four to five minutes. A reasonable inference from this evidence is that, after hitting Johnson in the head with a heavy object, Simmons saw that she was not dead, took off his necktie, and spent four to five minutes strangling her. This evidence is sufficient to support the jury's finding of deliberation. Point denied.

Simmons presents the argument that the burden of proof instruction improperly defines the term "reasonable doubt." This argument is again rejected. *See Kinder*, 942 S.W.2d at 330.

### E. PENALTY PHASE

### 1. Prosecutor's Comments

Simmons requests plain error review of one comment of the prosecutor made during the penalty phase opening statement and several comments made during the penalty phase closing argument. We need not pass on the merits of these allegedly improper comments. Having reviewed the entire record, we find that no manifest injustice or miscarriage of justice resulted from these comments even if they were improper and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20.

Simmons did object to the following comments of the prosecutor made during the penalty phase closing argument:

> What person in this world if they had some means at their disposal, a gun, a baseball bat, something—
>
> DEFENSE COUNSEL: Same objection.
>
> THE COURT: Objection is overruled.
>
> PROSECUTOR:—would not go to this woman's aid, and if it was necessary, bash him on the back of the head, you know, maybe say stop . . . and if you had to bash him hard enough to kill him, you would be justified, the person would be justified.

Simmons now argues that the prosecutor's argument was inflammatory and designed to arouse the jury's passions and prejudices. However, it is not at all clear that his objection at trial was based on the same theory. The "same objection" language references an earlier objection which, although far from clear, apparently tries to assert that the

prosecutor's argument is improperly personalizing the case to the jury:

> [A]nd you're standing there, or I'm standing there, any one of us is standing there watching it—
>
> DEFENSE COUNSEL: Judge, I'm going to object to the Prosecutor's intending to argue some type of something outside the instructions.
>
> THE COURT: That objection will be overruled. Let's keep it abstract, however, as to persons....

The timing of the two objections, interrupting sentences in which the prosecutor was surmising what could have happened if various persons were at the crime scene, lends support to the conclusion that the objections were based on improper personalization, as does the fact that Simmons' brief cites *State v. Raspberry*, 452 S.W.2d 169 (Mo.1970), a case that holds that the prosecutor may not personalize an argument to the jury. Furthermore, in his motion for new trial, Simmons framed this issue by claiming that the "trial court erred when it overruled defense counsel's objections to the prosecutor's penalty phase argument that *any juror or person* would have had the right to use deadly force to kill the attacker ..." (emphasis added). Therefore, we will review Simmons' contention for trial court abuse of discretion in failing to sustain an objection based on improper personalization. *See Kinder,* 942 S.W.2d at 329.

▮▮▮▮ Although, as the trial court acknowledged, the argument approaches the line separating proper argument from improper personalization argument, it does not cross the line. Improper personalization results, among other ways, when the prosecutor asks the jurors to place themselves or some identifiable person in the shoes of the victim or at the crime scene. *See Storey,* 901 S.W.2d at 901–02. The prosecutor's argument did not do so. Instead, it is more analogous to acceptable "societal self-defense" argument. *See State v. Kreutzer,* 928 S.W.2d 854, 876 (Mo.banc 1996). This point is denied.

### 2. Testimony

Simmons points us to several examples of witness testimony during the penalty phase to which his counsel did not object. He asserts that the trial court committed plain error by failing to declare a mistrial *sua sponte.* We need not pass on the merits of these alleged errors. Having reviewed the entire record, we find that no manifest injustice or miscarriage of justice resulted from these statements even if they were improper and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20.

### 3. Evidence of the Murder of Leonora McClendon

Simmons complains that during the penalty phase, the State presented extensive evidence of the murder of Leonora McClendon including rather gruesome autopsy photographs. The jury, however, did not find the murder of McClendon as an aggravating circumstance. Instead, they did find one of the three submitted statutory aggravators and eight of the nine submitted nonstatutory aggravators. These findings are sufficient to support the imposition of the death penalty and render the introduction of the McClendon evidence irrelevant. *See State v. Tokar,* 918 S.W.2d 753, 772 (Mo. banc 1996), *cert. denied,* — U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). The point is denied.

### 4. Prior Convictions/Bad Acts Evidence

▮▮▮▮ Simmons complains variously that his prior convictions were improperly explored in detail during the penalty phase of the trial and that prior acts for which he had not been convicted were introduced as evidence of his character and as nonstatutory aggravators. As a general proposition, however, the facts and circumstances surrounding prior convictions, not just the existence of those convictions, may be introduced during the penalty phase. *State v. Whitfield,* 837 S.W.2d 503, 511–12 (Mo. banc 1992); *State v. Debler,* 856 S.W.2d 641, 657 (Mo. banc 1993). The trial court has discretion to control the evidence concerning these circumstances. *Whitfield,* 837 S.W.2d at 512. In addition, prior unadjudicated criminal conduct may properly be heard by a jury during the pen-

alty phase of a trial. *State v. Petary*, 781 S.W.2d 534, 539 (Mo. banc 1989). We perceive no abuse of discretion by the trial court in its management of the evidence presented during the penalty phase of Simmons' prior crimes or unadjudicated criminal conduct. The point is denied.

5. Victim Impact Evidence

Simmons also contends that victim impact evidence introduced concerning the effect of the murders on the families of Cheri Johnson and Leonora McClendon rendered the penalty phase fundamentally unfair, so as to violate his right to due process. *See Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986). He also contends that all victim impact evidence introduced in criminal penalty phases before the amendment to sec. 565.030.4, RSMo 1994, which authorizes victim impact evidence, violates Mo. Const. art. I, sec. 21 (cruel and unusual punishment). Both contentions are frivolous.

The victim impact evidence from Johnson's family occupies three pages out of a penalty phase transcript of two hundred and ninety-four pages. This type of testimony is authorized both by *Payne*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720, and by sec. 565.030.4, RSMo 1994. The impact of this evidence does not possibly jeopardize Simmons' right to due process. The victim impact evidence concerning Leonora McClendon is rendered irrelevant because the jury declined to find the statutory aggravator of McClendon's murder. Additionally, Simmons' art. I, sec. 21 argument is simply incorrect; further, a statute would not be able to authorize victim impact evidence if it truly was contrary to the Missouri Constitution, which it is not. *See Wise*, 879 S.W.2d at 515–16. He was tried after the amendment to sec. 565.030.4, not before.

6. Aggravating Circumstances Instructions

Simmons claims that the trial court erred in submitting Instructions Nos. 20 and 21. Those instructions set forth the statutory and nonstatutory aggravating circumstances, respectively, and read as follows:

INSTRUCTION NO. 20

In determining the punishment to be assessed against the defendant for the murder of Cheri Johnson, you must first unanimously determine whether one or more of the following aggravating circumstances exists:

1. Whether the defendant murdered Cheri Johnson for the purpose of the defendant receiving money or any other thing of monetary value from Cheri Johnson.

2. Whether the murder of Cheri Johnson involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find

a. That the defendant inflicted physical pain or emotional suffering on Cheri Johnson and that the defendant did so for the purpose of making her suffer before dying;

b. That the defendant killed Cheri Johnson after she was rendered helpless by the defendant and that the defendant thereby exhibited a callous disregard for the sanctity of all human life;

c. That the defendant committed repeated and excessive acts of physical abuse upon Cheri Johnson, and that the killing was therefore unreasonably brutal.

3. Whether Cheri Johnson was a potential witness in a pending investigation, namely the forcible taking of her jewelry and the assault upon her person on November 30, 1987 and was killed as a result of her status as a potential witness. . . .

INSTRUCTION NO. 21

If you have found beyond a reasonable doubt that one or more of the aggravating circumstances submitted in Instruction No. 20 exists, then, in determining the punishment to be assessed against the defendant for the murder of Cheri Johnson, you may also consider:

1. Whether the defendant pled guilty to Fraudulent Use of a Credit Device on

May 31, 1984, in the Circuit Court of the City of St. Louis, State of Missouri.

2. Whether the defendant pled guilty to Passing a Bad Check: No Account on December 8, 1986, in the Circuit Court of the City of St. Louis, State of Missouri.

3. Whether the defendant pled guilty to Assault Third Degree of Stephen Davis on April 14, 1987, in the Circuit Court of the City of St. Louis, State of Missouri.

4. Whether the defendant pled guilty to Assault Third Degree of Jane Davis on April 14, 1987, in the Circuit Court of the City of St. Louis, State of Missouri.

5. Whether the defendant pled guilty to Trespass in the First Degree on April 14, 1987, in the Circuit Court of the City of St. Louis, State of Missouri.

6. Whether the defendant murdered Leanora [sic] McClendon as submitted in Instruction No. 22.

7. Whether the defendant stole the motor vehicle of Norma Whiteside as submitted in instruction No. 23.

8. Whether the defendant assaulted Michelle Aldridge as submitted in Instruction No. 24.

9. Whether the defendant has a bent or trait of character exhibited by a history of physical abuse toward women....

The jury found the statutory aggravating circumstance number 2, and all of the nonstatutory aggravating circumstances except number 6, McClendon's murder. Simmons contends that none of the aggravating circumstances contained in the above instructions should have been submitted to the jury, but only one of his complaints about the aggravating circumstances—the complaint involving the depravity of mind aggravator—has been preserved for appellate review. That aggravator, Simmons alleges, is unconstitutionally vague. This Court has repeatedly held, though, that the limiting provisions set out in Instruction No. 20, 2(a), (b), and (c) above, satisfy any vagueness concerns and that the aggravator is not constitutionally infirm. *State v. Harris,* 870 S.W.2d 798, 813 (Mo. banc 1994). The point is denied.

Simmons requests plain error review for his proposition that the nonstatutory aggra-vator "whether the defendant has a bent or trait of character exhibited by a history of physical abuse toward women" is duplicative of other aggravators. Aggravators submitted multiple times, he explains, are unconstitutional because they "do not channel the jury's discretion by narrowing the class of those eligible for death." Unlike statutory aggravators, however, nonstatutory aggravators are not designed to narrow the class of those eligible for death. Nonstatutory aggravators, however, perform no function in the "eligibility" stage of capital sentencing; they are simply an incomplete list of facts relevant to whether or not the defendant should be sentenced to death at the "selection" stage. *See State v. Brown* 902 S.W.2d 278, 293(Mo. banc 1995) (holding that a nonstatutory aggravator's duplication of facts from a statutory aggravator was harmless error, if error at all). The point is denied

Finally, Simmons posits that the State was collaterally estopped from presenting certain nonstatutory aggravators because the jury at his first trial declined to find these aggravators. Simmons misunderstands the nature of final judgments and collateral estoppel. As a general proposition, collateral estoppel bars relitigation of a specific fact or issue that was unambiguously determined by a previous jury. *State v. Nunley,* 923 S.W.2d 911, 922 (Mo. banc 1996). Its import in the criminal context is that if a jury has decided an "ultimate fact," that fact is barred from relitigation. *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). The jury's decision, however, must be distilled to a specific, unambiguous, and necessary finding of one particular fact, or finding on one specific issue, for that fact or issue to be barred from relitigation. *See Nunley,* 923 S.W.2d at 922; *State v. Johnson,* 598 S.W.2d 123, 125–26 (Mo. banc 1980); *State v. Booker,* 540 S.W.2d 90, 93 (Mo.App.1976) (noting that because it is usually impossible to discern a specific basis upon which a jury reaches its verdict, collateral estoppel will rarely be available in a criminal context).

In the first trial, the jury's failure to find the particular nonstatutory aggravating circumstances were not "findings" at all, but

rather a lack of them, and the *Ashe* rationale does not even apply. A jury is not called on to make a specific finding one way or the other, such as guilty or not guilty, or "yes" the aggravator has been proved or "no" the aggravator has not been proved. Instead, a jury is instructed merely to list on the verdict form those aggravators that it has, in fact, found, and there is no specific requirement that a finding be made that the other proposed aggravators were not found. *See* MAI–CR3d 313.48B; MAI–CR3d 313.58B1.A. Moreover, the failure to make a finding does not necessarily mean that the aggravator was not proved. A jury is instructed three times to determine whether "one or more" aggravating circumstances exist before it can deliberate on the death penalty. MAI–CR3d 313.41B; MAI–CR3d 313.42B; MAI–CR3d 313.48B. Once a jury finds that one or more aggravators exist, as it did in the first case, it is unnecessary for it to pass on the other proposed aggravators. A particular aggravator, for instance, may be avoided because it is more difficult to judge, even though with further review, a jury might well decide that adequate proof was made on that particular aggravator. For these reasons, collateral estoppel does not apply. The point is denied.

7. Other Penalty Phase Instructional Errors

Simmons argues that the mitigating circumstances instruction, which instructs the jury that they "must" determine whether there are mitigating circumstances and continues on to list specific items which they "may" consider, misstates the law. This claim has been repeatedly rejected. *State v. Copeland*, 928 S.W.2d 828, 853 (Mo. banc 1996). We do so yet again.

▮ Additionally, Simmons contends that the deliberation scheme erected by sec. 565.030, RSMo 1994, is unconstitutional in violation of his rights to due process, trial by jury, and freedom from cruel and unusual punishment. Specifically, Simmons argues that the fact that the jury must first find that the aggravating circumstances are sufficient to warrant the imposition of death before it begins considering balancing the mitigating

circumstances against the found aggravating circumstances impermissibly shifts the burden of proof to the defendant. As we have explained in previous cases, however, the jury's decision that the death penalty is *warranted* is not the same as its deciding that it *shall be imposed*. *State v. Tokar*, 918 S.W.2d 753, 771 (Mo. banc 1996). In fact, the order of proceedings actually presents an advantage to the defendant by requiring the state to completely prove its aggravating case before allowing the jury to even consider application of the death penalty. *Id*. Moreover, it would be illogical to have the jury consider mitigators if it had not first found that the death sentence was warranted and if it had not found aggravators against which to balance the mitigators. The statute and the instructions based on it meet Simmons' constitutional concerns.

### F. SENTENCING ORDER

Simmons next contends that the trial court erred in entering its order of September 30, 1994, sentencing Simmons for the murders of Cheri Johnson and Leonora McClendon, because the order was not based solely on the facts and evidence presented during the trials. To support his contention, he directs this Court's attention to the following paragraph in the sentencing order:

> Willie Simmons was fairly well embarked upon a career which might have rivaled that of the infamous Ted Bundy, but for a sharp-eyed detective, who noticed a florist's distinctive wrapping paper in the apartment of one of the victims, and a narcissistic propensity to appear in his own photographs....

Simmons argues that the reference to the serial killer shows that the trial court improperly sentenced him based on concern about his future dangerousness. The trial court adequately explained, however, in the Rule 29.15 findings that:

> Taken in context, the Court's reference to Simmons' criminal history as that of an incipient Ted Bundy is not so much a finding concerning Simmons, as it is hyperbole in praise of Detective Maier's police work. In or out of context, however, the reference betrays no inability to render

fair judgment, since the career of Willie Simmons at the time the Court wrote its memorandum in September, 1994, included killing two women, assaulting three others, and threatening a female witness against him. The Court does nothing more than observe that this career "might well have .rivaled" that of Bundy, had not good police work ... led to his arrest and conviction. We find no reason to doubt the trial court's explanation of the Ted Bundy reference. The court committed no error in entering its judgment accepting the jury's assessment of punishment for the murders of Cheri Johnson and Leonora McClendon.

## III. ALLEGATIONS OF RULE 29.15 MOTION COURT ERRORS

### A. MOTION TO DISQUALIFY JUDGE

■■■ Simmons argues that the motion court clearly erred in denying his motion to disqualify the judge, who presided over the underlying trial, from presiding over the Rule 29.15 proceeding. His grounds for disqualification were the judge's alleged bias and the judge's alleged status as a potential witness to some of the Rule 29.15 claims. A disqualifying bias arises if a reasonable person would find an appearance of impropriety and doubt the impartiality of the court. *Kinder*, 942 S.W.2d at 321. To support his claim of bias, Simmons again points to the sentencing order entered by the judge on September 30, 1994, for the murders of Leonora McClendon and Cheri Johnson. Specifically, Simmons alleges that the Ted Bundy reference, quoted above in Point II.F, and the following paragraphs of that order reveal bias:

The Court, ... agreeing wholeheartedly with the sentence recommended by each jury, will deny the motions for judgment of acquittal or new trial and sentence Simmons accordingly....

Upon review of the law and the record, the Court is convinced beyond doubt that each jury's assessment of punishment on the counts in this case is fair, just, reasonable and in accordance with the law. Without wishing to turn a deaf ear in advance to any plea for mercy at allocution, the Court is bound to say that the

defendant richly deserves the supreme penalty in this case. The murder of Leonora McClendon was particularly brutal and repulsive, and defendant's future on death row is not likely to be any more agonizing than Leonora McClendon's death agony in the bathtub following defendant's ministrations; and his end, when it finally comes after the wheels of justice have ground slowly and exceedingly fine, will be merciful in comparison....

Simmons argues in a conclusory fashion that these comments would cause a reasonable onlooker to conclude that the judge was prejudiced, without any attempt to identify the particular bias these comments allegedly reveal. We can see no bias revealed in the above paragraphs that would cause a reasonable onlooker to question the judge's ability to impartially consider Simmons' Rule 29.15 motion. The comments properly express reasons for agreeing with the jury's recommendation of the death sentence for both murders.

■■■ Simmons also complains that the following statement contained in the Rule 29.15 judgment reveals bias:

The Court was convinced after the jury's verdicts in 1994 that Willie Simmons murdered both women; the Court remains convinced, and reiterates its finding beyond a reasonable doubt that Simmons is in fact guilty of both crimes.

The judge's continued belief after the post-conviction hearing that Simmons was guilty does not impinge upon his ability to impartially consider Simmons Rule 29.15 claims. In what appears to be an additional allegation of bias, Simmons argues that the judge could not fairly judge Simmons' Rule 29.15 claim of incompetency because the judge would be justifying his failure before trial to order a court-ordered mental exam. An interest in upholding trial court actions, though, is not a disqualifying bias. *Wise*, 879 S.W.2d at 523. Simmons' allegations of bias lack any merit.

■■■ As to the allegation that the judge should have been disqualified because of potential witness status, the only Rule 29.15 claim identified by Simmons as requiring the

judge to be a witness is his claim that judges are assigned to death cases in St. Louis City based on their views on the death penalty. Simmons has failed to assert a compelling reason to have called the judge as a witness to support this claim at the postconviction hearing. *See id.* The judge did not clearly err in denying the motion to disqualify.

## B. CONSTITUTIONALITY OF RULE 29.15

Simmons challenges the constitutionality of the time limits imposed by Rule 29.15. This constitutional challenge is again rejected. *See Storey,* 901 S.W.2d at 900.

## C. ATTORNEY SANCTIONS

During the course of postconviction proceedings, the State repeatedly requested that, for various abuses, sanctions be imposed against Simmons' postconviction counsel. After consideration of the State's motions, and after conferencing with counsel from both sides, the postconviction court sanctioned Simmons' counsel, imposing a $250.00 fine. Preliminarily, we reject Simmons' counsel's contention that he did not have adequate notice and opportunity to respond to the motions for sanctions. These motions were properly served upon Simmons' counsel who did indeed respond to the motions; Simmons' counsel responded to these sanction requests, at least insofar as they concerned improper discovery attempts, in various filings.

The court based its sanctions on its findings that the following claims, asserted by Simmons' postconviction counsel, were frivolous, unreasonable and without foundation: (1) that Simmons' trial counsel was ineffective in failing to offer an alternative written instruction on "reasonable doubt;" (2) that exclusion of jurors who were unable to consider the full range of punishment violated the jurors' constitutional rights; (3) that the prosecutor engaged in misconduct; and (4) that Missouri's death penalty is unconstitutional because of prosecutorial discretion. The court also found that Simmons' counsel filed three postconviction discovery motions "solely for the purpose of harassing or vexing

the State in the defense of the postconviction motion...."

Rule 55.03(b) states, *inter alia,* that by filing a pleading, motion, or other paper with a court, the attorney or party is certifying that the claims presented are not intended to harass or cause unnecessary delay, are warranted by existing law or nonfrivolous argument for the extension, modification, or reversal of existing law, and have evidentiary support or are likely to have support after a reasonable opportunity for further investigation or discovery. Rule 55.03(c) provides that sanctions may be imposed for violations of Rule 55.03(b). This rule applies to postconviction proceedings. *Thurman v. State,* 859 S.W.2d 250, 254 (Mo. App.1993). Because the imposition of sanctions is not an action upon a Rule 29.15 motion as described in Rule 29.15(j) (1994), we review the decision for abuse of discretion. *See State v. Duong,* 935 S.W.2d 87, 88 (Mo.App.1996); *State v. Gardner,* 932 S.W.2d 858, 862 (Mo.App.1996).

From our review of the record, the postconviction court did not abuse its discretion in imposing these sanctions on Simmons' counsel. Three of the claims cited, those concerning the reasonable doubt instructions, the death penalty constitutionality, and juror disqualification, have been firmly and uniformly rejected by previous decisions of this Court and the federal courts. *See State v. Chambers,* 891 S.W.2d 93, 105, 113 (Mo. banc 1994) (reasonable doubt, constitutionality of death penalty); *State v. Harris,* 870 S.W.2d 798, 805–06 (Mo. banc 1994) (juror disqualification); *Davis v. Georgia,* 429 U.S. 122, 122–23, 97 S.Ct. 399, 399–400, 50 L.Ed.2d 339 (1976) (juror disqualification); *Murray v. Delo,* 34 F.3d 1367, 1381–82 (8th Cir.1994) (reasonable doubt instruction); *Battle v. Delo,* 19 F.3d 1547, 1562 (8th Cir.1994) (death penalty constitutionality). In his postconviction motion, counsel did not present arguments designed to confront and refute these decisions. Rather, he simply rehashed the arguments that these decisions had already rejected. This practice does not constitute "a nonfrivolous argument for the extension, modification, or reversal of existing law...." Rule 55.03(b)(2). Counsel's assertion that

preservation of these claims for federal review warrants their inclusion in the Rule 29.15 motion is unconvincing. Preservation of these claims is unnecessary because, as stated, the federal courts have rejected these same claims in other cases. Had the federal courts not rejected the claims previously, counsel's argument would be much more tenable. But to preserve the claims in the mere hope that the federal courts might someday change their position would effectively preclude any claim from ever being frivolous and would render Rule 55.03(b) inoperative in all cases where federal review is possible. In short, this Court will not allow counsel to escape sanctions under Rule 55.03(b) merely by invoking the words "federal review."

The general allegations concerning prosecutorial misconduct at trial were unsupported by citations to the trial transcript or record both of which were fully available to Simmons' counsel.[1] Simmons does not explain how or why further investigation or discovery would be likely to uncover such misconduct. Therefore, the postconviction judge did not abuse his discretion in finding that these allegations violated Rule 55.03(b)(3).

Undoubtedly, sanctioning an attorney under Rule 55.03(c) is a serious matter and should only be undertaken after careful consideration of the circumstances of the attorney's actions and the case before the court. We find that the trial judge undertook such careful consideration. Although no single violation of Rule 55.03(b) as found by the postconviction court necessarily warrants the imposition of the sanctions, the several violations, when viewed as a whole, support the $250.00 fine.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

▬ Simmons makes several allegations of ineffective assistance of counsel. We address only those allegations that have not been rendered moot by our rejection of the underlying claims of error. To win reversal

of his conviction or death sentence because of ineffective assistance of counsel, Simmons must show that his counsel's performance was deficient, i.e. below the degree of skill, care, and diligence of a reasonably competent attorney, and that the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) ; *Tokar*, 918 S.W.2d at 761. Indeed, he must show that his counsel failed both the performance and prejudice prongs of the *Strickland* test, and if he fails to satisfy either prong, we need not consider the other. *Sidebottom v. State*, 781 S.W.2d 791, 795–96 (Mo. banc 1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). In reviewing the performance prong, Simmons must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment. *Strickland*, 466 U.S. at 689–90, 104 S.Ct. at 2065. Counsel's actions that constitute sound trial strategy are not grounds for ineffective assistance claims. *Storey*, 901 S.W.2d at 893. To prove prejudice, Simmons must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Tokar*, 918 S.W.2d at 761. Finally, the determinations of the motion court will not be disturbed unless they are clearly erroneous. Rule 29.15(m), 29.15(j) (1994); *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987).

### 1. Simmons' Competency to Stand Trial

Simmons contends that trial counsel was ineffective for failing to adequately investigate and present to the trial court the possibility that Simmons was incompetent to proceed to trial. Before his trial, Simmons' trial counsel had access to reports from four mental health professionals: (1) Dr. Daniel; (2) Dr. Fleming; (3) Dr. Parwatikar; and (4) Dr. Peterson. The reports by Dr. Daniel and Dr. Fleming had been completed in connection with Simmons' original trial for the mur-

---

1. Simmons' counsel did specifically allege two instances of conduct, one relating to the prosecutor's distribution of campaign literature, and one referring to his disqualification of Judge Peek. While these incidents were not found to constitute misconduct, they were sufficiently specifically alleged to comport with Rule 55.03(b).

ders of both Johnson and McClendon. Dr. Daniel determined that Simmons had no diagnosable psychiatric disorder, but Dr. Fleming reported that Simmons suffered from a delusional disorder that rendered him incompetent to proceed.

Drs. Parwatikar and Peterson were appointed during preparation for Simmons' separate trials for the murders of Johnson and McClendon. Dr. Parwatikar concluded that Simmons was competent to proceed to trial. This conclusion was based solely on the reports and data of others because Simmons refused to participate in an examination. Likewise, Simmons was uncooperative with Dr. Peterson. Dr. Peterson did issue a report but was unable to address the issue of Simmons' competency to stand trial.

After his separate trials, Simmons received additional examinations in preparation for the Rule 29.15 proceeding. Dr. Peterson again examined Simmons and this time concluded that he was not competent to assist his attorneys. Simmons was also evaluated by Dr. Harry, a psychiatrist appointed on the motion court's own motion. Dr. Harry concluded that Simmons had a mental disease or defect but was competent to stand trial, both at the time of the evaluation and at the time of his trials. He determined that Simmons understood the proceedings against him based on the following factors: (1) he was able to describe the roles and functions of the major participants in courtroom proceedings; (2) he was aware of various legal defenses available to him; (3) he was aware of legal strategies including guilty pleas to lesser charges; (4) he understood court procedures; (5) he appreciated the charges against him as first degree murder; (6) he appreciated the range and nature of possible penalties should he be convicted; and (7) he was aware of the possible outcome. He also determined based on numerous additional factors that Simmons had the ability to assist his attorneys.

 Simmons contends that trial counsel was ineffective for failing to conduct additional pretrial investigation into his competency to stand trial. However, trial counsel already had four mental health reports on Simmons. Further, Simmons had refused to cooperate with at least three of the psychia-

trists that counsel had obtained to assist in the investigation, so counsel had no reason to believe that Simmons would cooperate with any other mental health experts. Under these circumstances, counsel's failure to pursue additional investigation into Simmons' competency status cannot be deemed unreasonable.

 Simmons also accuses trial counsel of ineffectiveness in failing to present the issue of competency to the trial court. The conflicting reports that were available on Simmons' mental status, however, provided little assistance in evaluating his competency. Moreover, trial counsel testified at the post-conviction hearing that based on their extensive dealings with Simmons they believed that he did understand the proceedings against him and that he was able to assist them. We find that counsel's performance was not deficient. In addition, we agree with the motion court's conclusion that Simmons was not prejudiced because he was competent to proceed to trial. The report of Dr. Harry fully supported the conclusion that Simmons was competent. The motion court found that Dr. Peterson's testimony lacked credibility and, therefore, rejected his finding of incompetency. We give deference to the motion court's superior opportunity to judge the credibility of the witnesses. *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991).

We conclude that the motion court did not clearly err in denying Simmons' claims that his trial counsel was ineffective with regard to the competency issue.

### 2. Failure to Object to Voir Dire Comments

 Simmons presents for review several statements of the prosecutor made during voir dire and claims that his counsel was ineffective for failing to object to them. These statements include (1) repeatedly stating that the jury would provide a "recommendation" to the judge; (2) stating that all of the jury's guilt and penalty phase decisions have to be unanimous; (3) telling the jury that it could impose the death penalty if it thought or formed the personal opinion that death was appropriate and just; (4)

various statements of the prosecutor to the effect that he would prove everything he was supposed to and that he represented the State; (5) allegedly encouraging the jury to prejudge the case by discussing the penalty phase as if they would reach it; and (6) several statements that Simmons interprets as seeking a commitment from the jurors to vote a certain way.

After review of these statements, we conclude that, even if objectionable, there is no reasonable probability that the outcome of the trial would have been different had there been successful objections. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Therefore, counsel cannot be considered ineffective for failing to object. A particularized ineffective assistance of counsel analysis of each remotely objectionable statement made during the course of a trial would serve no purpose other than to encourage future litigants to micro-dissect the transcript, as has occurred here. We do not choose to encourage this type of appellate practice. *See Brown,* 902 S.W.2d at 300.

Simmons also recites statements of the trial judge during voir dire and labels them objectionable. These statements intimated that the jurors would not enjoy their service, were paid by the taxpayers, and that the process of criminal prosecutions was like a game, and should be speeded along. Apparently, Simmons' conclusion is that these statements induced the jurors to hasten their decisions at the end of the guilt and/or penalty phases and not properly consider the evidence. Simmons offers no evidence to support that conclusion, and we do not share it. There was no ineffective assistance for not objecting.

3. Failure to Object to Remarks in Guilt Phase

During his guilt phase opening statement, the prosecutor stated that Simmons "deliberately, premeditatedly, after the lady pleaded with him, bludgeoned her to death...." Simmons contends that his counsel was ineffective for failing to object to this statement. This lone remark during opening argument does not give rise to a reasonable probability that the outcome

would have differed had defense counsel objected. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. No ineffective assistance is shown.

Simmons also complains of numerous statements during the prosecutor's guilt phase closing argument. Three of these statements were objected to, but Simmons asserts that his counsel was ineffective for failing to preserve them for appellate review because counsel did not include them in his motion for new trial: (1) that no evidence pointed to anyone but Simmons as the killer; (2) that the prosecutor hopes that Johnson was not alive during some of Simmons' brutal acts; and (3) telling the jurors that when they are through with this case, they will be free to talk to their friends and associates. There was no objection to the remainder of the complained-of comments, and Simmons asserts ineffective assistance of counsel for failure to do so: (1) ruminating on Johnson's possible future; (2) saying, "[d]id you hear that he was not guilty? Did you hear that this evidence shows him innocent?"; (3) saying, "when the Judge tells you that on or about November 30th the defendant caused the death of Cheri Johnson by strangling and suffocating her—let's leave the defendant word out of there ...."; (4) opining that if there was no deliberation in this case, then there is no deliberation in any murder; (5) complementing the police work; (6) commenting on Simmons' usual style with women and that Simmons "is a cold-blooded lady killer"; (7) describing many methods of murder that are not included in the instructions, presumably to bolster the chances that this method of murder still constitutes the instructed-on crime; (8) comparing the confrontation between Simmons and Johnson, unfavorably, to a professional boxing match; and (9) telling the jurors that they "can't feel or see the panic" that Johnson must have felt at the time of the murder.

We have reviewed the foregoing guilt phase arguments and determine that counsel was either not deficient in failing to object or that no prejudice resulted from the failure to object. An extended analysis of each statement would offer no precedential value. The point is denied.

### 4. Failure to Object to Guilt Phase Testimony

Simmons challenges a number of statements from various witnesses' testimony and asserts that his counsel was ineffective for failing to object. Simmons first alleges improper victim impact evidence in (1) Johnson's mother testifying that she gave a particular ring to her daughter and that her daughter agreed to give it to *her* daughter; and (2) a defense witness testifying on cross-examination that Johnson was a nice lady with whom he went to church. The first statement is not victim impact evidence but, rather, direct evidence that Johnson would not have given Simmons the ring voluntarily. The second statement, even if arguably victim impact evidence, is so totally innocuous as to warrant no further discussion.

Simmons also faults counsel for failing to object to what he believes to be hearsay: (1) a detective testifying that a particular witness told him that he, the witness, had called Johnson; (2) the same detective testifying that two other witnesses/potential suspects had given him alibis that checked out; (3) a detective testifying that a woman had identified Simmons from a photograph; (4) a detective testifying that flower shop employees had identified Simmons; and (5) a witness testifying that he knew that Johnson had caller ID. Incredibly, the first statement was elicited in response to specific questions from Simmons' counsel. The remainder of the statements are either not hearsay or present no possibility that, if they had been objected to, the outcome of the trial would have been different.

Additionally, Simmons complains that counsel failed to object to impermissible "other crimes" evidence regarding these statements: (1) a flower shop employee testifying that she identified Simmons in 1989; (2) one of Simmons' previous bosses testifying that Simmons was fired in November 1987; (3) a witness testifying that she asked Simmons to move out of her home in October 1987; and (4) a detective testifying that he canvassed a building with Simmons' photograph in December 1987. The first is not an obvious reference to Simmons' first trial. The second and third are not comments on

previous crimes. The fourth is a reference to Simmons' "mug shot photos" even more veiled than the argument we have already rejected directly.

There is no ineffective assistance of counsel in the failure to object to any of these statements during guilt phase. All in all, defense counsel appears to have done a remarkable job of objecting at the proper times.

### 5. Penalty Phase Evidence

#### a. Mental Health Evidence

Simmons contends trial counsel was ineffective for failing to adequately investigate and present evidence of a mental disease or defect during the penalty phase. As outlined above, four mental health professionals completed evaluations of Simmons' mental health status. Simmons now contends that if trial counsel had provided the mental health professionals with more information, they would have been able to render more complete diagnoses that would have been helpful in the penalty phase. He ignores the statements in the reports of Drs. Parwatikar, Fleming, and Peterson that the reason they could not give a more complete diagnosis was Simmons' failure to cooperate in the examination process. Simmons is now attempting to blame his attorneys for the incomplete evaluations, when it is clear that the lack of a complete evaluation was due to his own voluntary actions. Further, in spite of Simmons' uncooperative nature, his trial counsel was able to obtain a report from Dr. Peterson that focused on relevant mitigating factors. Under these facts, we agree with the motion court's conclusion that Simmons' trial counsel conducted a reasonable investigation of his mental status.

Simmons also asserts that counsel was ineffective for failing to present available mental health information as mitigating evidence. In particular, he insists that counsel should have called Dr. Peterson to testify concerning relevant mitigating factors. Nevertheless, trial counsel testified at the post-conviction hearing that a strategic decision was made not to call Dr. Peterson during the penalty phase because his report would have

been disclosed to the State and portions of it were particularly damaging to Simmons. Specifically, Dr. Peterson had noted that Simmons displayed "anger at women," that he linked statements of "love with precipitous physical aggression," and that "his own control over the switch from affection to physical violence after rejection or criticism was virtually non-existent."

Although Simmons emphasizes the need for mitigating evidence and discounts the harm that such evidence might cause him, we agree that Dr. Peterson's testimony would have reinforced the State's portrayal of Simmons as a predator who was violent towards women. As stated by the motion court:

> The last thing Simmons needed in defending a circumstantial case was psychiatric evidence which would demonstrate that he was psychologically capable, if not predisposed, to precisely the kind of violence against women which the State was positing.... It was entirely reasonable for [trial counsel] to conclude that delving into Simmons' psyche in front of a jury would be aggravating, not mitigating, and would play directly into the State's hands.

It is clear that in this case Simmons has failed to overcome the presumption that trial counsel's decision not to pursue mental health evidence as a mitigating factor was sound trial strategy.

We find that the motion court did not clearly err in concluding that trial counsel was not ineffective in the investigation or presentation of Simmons' mental health status.

### b. Background Evidence

■ Simmons also asserts that his penalty phase defense was insufficient for lack of presentation of mitigating evidence concerning his background and upbringing. His mitigating defense consisted solely of his mother's testimony which emphasized the fact

that she loved her son, missed him at holidays, would continue to love him if he served life in prison, and would draw value from a continued relationship with him. The defense strategy was not to seek mercy for Simmons' sake, but to demonstrate that there was a person, his mother, who would draw value from Simmons' continued existence, and who would suffer a loss from his death.

Simmons now argues that defense counsel should have offered more extensive mitigating evidence. He raises many aspects of his childhood (and his parents' childhood) that he considers as "mitigating."[2] These include both positive and negative aspects of his life. He cites, for example, both the fact that he enjoyed art as a grade school student and the fact that he had to repeat grades in grade school.

During the penalty phase of Simmons' first murder trial, defense counsel had, in fact, placed much of this information before the jury. That jury, however, decided that the information did not mitigate the aggravating circumstances and sentenced Simmons to death. Considering that the strategy had once failed, and that calling Simmons' relatives to testify about his upbringing would inevitably highlight the fact that his brother had endured the same upbringing yet had become a successful doctor, we agree with the reasoning of the Rule 29.15 court:

> In light of all the information available to them, after discussion with their client, trial counsel decided to rely at penalty phase solely on a plea for mercy from Simmons' mother. This decision was premised on the demonstrated ineffectiveness of prior strategy concerning mitigating circumstances, which had sought to use testimony from [a person who went to church with Simmons' mother] and one of Simmons' previous work supervisors, the

---

**2.** The background/upbringing information included, *inter alia:* (1) his parents came from the poor, racist South; (2) his mother was strict with him and sometimes beat him; (3) his father had a possible drinking problem; (4) his parents fought and Simmons sometimes tried to intervene; (5) his mother joined a restrictive religion and tried to get Simmons to join, also; (6) he,

alternatively, either enjoyed school and did adequately, or did poorly in school; (7) he ran away from home at age 12 or 13 and was assaulted in Chicago; and (8) a judge's comments at a 1980s plea hearing, in which the judge said that Simmons had been one of her "good kids on probation."

belief that comparisons by the jury between Simmons and a successful sibling ... would be harmful, and the conclusion that the mother's plea was the best hope.... In the final analysis, 1994 trial counsel concluded, rightly, that delving too deeply into Simmons' social history and upbringing would do more harm than good, by opening up dangerous avenues for the State to explore: "areas of danger," in [defense counsel's] words.

The penalty phase course of action was clearly sound trial strategy and, therefore, does not constitute ineffective assistance of counsel. *See Storey,* 901 S.W.2d at 893.

### 6. Failure to Object to Penalty Phase Arguments

Simmons complains of a multitude of statements during the prosecutor's penalty phase closing argument. The only statement objected to, for which Simmons argues ineffective assistance of counsel for failing to preserve it for appellate review by omitting it from his motion for new trial, was where the prosecutor said, "[i]n talking to the police, did you ever hear him say one time...." At this point, Simmons' objection was overruled, and the prosecutor continued to ask, "did you ever hear [Simmons say he was sorry]?" There was no objection to the remainder of the complained-of comments of the prosecutor, and Simmons asserts ineffective assistance of counsel for failure to do so: (1) saying he felt in his heart that the case would end up in penalty phase; (2) speaking of his daughters and stating that he would have difficulty following the law if they were murdered; (3) various comments referencing Simmons' constitutional rights and his exercising of his right to trial; (4) arguably personalizing the case to the jury by mentioning women, daughters, sisters and wives as those who should not have to fear people like Simmons; (5) arguing two points allegedly not supported by the evidence—what Simmons might have said to Johnson, and that Simmons has a history of abuse toward women; (6) saying that if there was no deliberation in the murder of Leonora McClendon, "there is no murder in this United States that could classify as deliberation then. I mean, there's not probably a worse horrible crime"; (7)

telling the jury that if they do not decide on punishment, the judge will; (8) surmising that Johnson's father is "hoping and waiting" for the jury to do what he cannot; (9) arguing that the circumstances of the McClendon murder exhibited depravity of mind; (10) saying that Simmons deserved death for "everything that he has chosen to do in his life" and (11) making indirect references to cases from other jurisdictions.

As with the guilt phase arguments, we have reviewed the foregoing penalty phase arguments and determine that counsel was either not deficient for failing to object or that no prejudice resulted from the failure to object. An extended analysis of each statement would offer no precedential value. The point is denied.

### 7. Failure to Preserve Penalty Phase Argument

During Simmons' penalty phase closing argument, the prosecutor objected to the statement that "men convicted of far worse killings have been allowed to live." The court sustained the objection on the basis that there was no evidence in the record to support the statement. Simmons now claims that his counsel was ineffective for failing to preserve in his motion for new trial the issue of whether the argument should have been allowed because it was proper mitigating evidence. However, "improper mitigating evidence" was not the basis of the sustained objection, and Simmons' postconviction motion merely alleged ineffective assistance of counsel for failing to present, earlier in the penalty phase, evidence to support the stricken statement. Therefore, post-trial counsel have not properly preserved this point for appellate review.

## IV. PROPORTIONALITY REVIEW

██ Under sec. 565.035, RSMo 1994, this Court is required to review the proportionality of the sentence of death imposed in this case. There is no evidence in the record before us that the jury or judge imposed the sentence of death under the influence of passion, prejudice, or any other arbitrary factor. Further, the statutory aggravating circumstance found by the jury, namely that the

murder of Cheri Johnson involved depravity of mind, and was outrageously and wantonly vile, horrible, and inhuman, is amply supported by the evidence.

The death sentence in this case also is neither excessive nor disproportionate to the penalty imposed in similar cases. Johnson had been savagely beaten and strangled for four to five minutes before she died. The restraining necktie remained around her neck. Death by strangulation, after beating or other serious wounding of the victim, has supported previous death sentences. *See State v. Kreutzer*, 928 S.W.2d 854, 860 (Mo. banc 1996); *State v. Stokes*, 638 S.W.2d 715, 717–18 (Mo. banc 1982). Simmons' previous actions, assaulting other women and murdering Leonora McClendon, exhibited a pattern of crime, further supporting the imposition of the death sentence. *See State v. Rodden*, 728 S.W.2d 212, 222 (Mo. banc 1987).

## V. CONCLUSION

For the above reasons, the judgments are affirmed.

All concur.