STATE of Missouri, Respondent,

v.

Donald Joe HALL, Appellant.

No. 77481.

Supreme Court of Missouri,
En Banc.

Dec. 1, 1998.

Rehearing Denied Jan. 20, 1999.

Deborah B. Wafer, St. Louis, for Appellant.

Cassandra K. Dolgin, Asst. Atty. Gen., Jefferson City, for Respondent.

WILLIAM RAY PRICE, Jr., Judge.

A jury convicted Donald Hall of first-degree murder for killing Bill White on December 15, 1992. The jury recommended, and the trial court imposed, a death sentence. Hall then filed a post-conviction motion pursuant to Rule 29.15 alleging ineffective assistance of trial counsel. The motion court held a three-day hearing, took evidence, and overruled the motion.

Hall now appeals his conviction and the motion court's denial of post-conviction relief. Because Hall was sentenced to death, we have exclusive jurisdiction over the appeals. *Mo. Const. art. V, Section 3.* We affirm the judgments.

## I. FACTS

Around December 10, 1992, Kimball Morton took Donald Hall to Bill White's jewelry store in Springfield, Missouri, to have a necklace fixed. While Morton and Hall were in the store, White looked at the necklace and the three men discussed gold coins. Morton and Hall left the store with the necklace. Later that day, Hall talked to Morton about "going in there and robbing and killing Bill

White." Hall told Morton it would be "real easy going in there and robbing and killing Mr. White, there wasn't no security, no cameras or nothin'." Morton told Hall he was not "up to that." Hall then asked Morton if he wanted to "be the wheel man, to drive," and Morton said he was not sure. Hall told Morton that "[a]ll [they would] have to do is walk in there and shoot him in the head," and then steal his jewelry and money. Morton expressed reluctance in helping Hall commit the crime, and Hall dropped the subject.

On December 15, 1992, Donald Hall's ex-wife Donna Hicks, who was living with Hall, woke up around 10 a.m. to find Hall and Hall's car gone. Hall was seen walking toward Bill White's jewelry store at approximately 10:30 a.m. on that day. Charles Ingram testified that he and Charles Slater were parked near White's jewelry store around 10:30 a.m. The two men saw Hall walking toward the jewelry store and noticed a white car parked down the street. Later both Ingram and Slater were shown a photograph of Hall's car and recognized it as the car they saw parked down the street from the jewelry store.

Around 11 a.m., Hall returned to the apartment and told Hicks that he wanted her to drive him to White's jewelry store. Hall said he wanted to have a necklace fixed. Hicks agreed. She dropped Hall off at White's store and parked about one block away.

Hall returned to the car less than ten minutes after Hicks dropped him off. He was carrying a paper bag and he had blood on his hands. Hall said he "just blew the man's brains out." When Hicks asked him whether White was dead, Hall responded, "If I took this gun and put it to your head and pulled the trigger and blew your brains out, don't you think you'd be dead?"

Hall told Hicks that he went into the store and approached White, who was sitting behind the store counter. He showed White a necklace and asked him to fix it. Hall told Hicks that when White bent over to get a clasp to fix the necklace, Hall "put [the gun] straight – close to his head, right up against his head, and pulled the trigger...." He then pulled White's body from the chair to the floor so that he could retrieve White's wallet from his back pocket. Hall told Hicks several times that he killed White because "the only good witness is a dead witness."

Hall told Hicks that while he was still in the store, Linda Garrison approached White's storefront with her son, mother, and stepfather. Hall crept to the door and locked it before the Garrisons could enter. He waited for them to leave and then filled a paper bag with a metal jewelry box, the wallet from White's pocket, and the gun he used to shoot White, and returned to the car.

Hall and Hicks drove to Springfield Lake to dispose of the gun. Hall sat in the passenger seat and removed the wallet from the paper bag and looked through the jewelry box, which contained car titles, other documents, and jewelry. On the way to the lake they stopped at a gas station where they purchased gas and where Hall washed the blood off of his hands with gasoline. When they reached Springfield Lake, Hall threw the gun and clip into the lake. He also weighted the metal jewelry box with rocks and threw it into the lake.

On their way back from the lake, the two stopped along a roadside to burn White's wallet and some documents that were in White's jewelry box. Hall also hid the stolen jewelry inside a guardrail along another roadside. Hicks and Hall then returned to their apartment, and Hicks washed Hall's bloodstained jeans. Three days after White's murder, on December 18, Hall and Hicks retrieved the jewelry from inside the guardrail and left for Kansas City where they spent about one week selling the jewelry at various pawn shops.

About three weeks later, on January 8, 1993, Hall was arrested for an unrelated drug charge. On January 9, Hicks contacted the Springfield police department. The police detectives took her to a motel where they videotaped Hicks as she described the events surrounding White's murder. Hicks then took the police to Springfield Lake and led them to the locations where Hall and Hicks had burned some of the items from White's store. From these locations the police recov-

ered charred items, including the remains of White's wallet and White's driver's license.

Hicks also gave the police an envelope containing a diamond ring that Hall sent to Hicks' apartment. Hicks identified the ring as one that Hall had taken from White's store. She told the police that Hall wore the ring on his pinky finger up until the day he was arrested for the drug charge, at which time he placed the ring in the envelope and sent it to Hicks. At trial, Hicks identified a photograph of Hall in which he is wearing the ring on his pinky finger. Hicks testified that she took the photograph of Hall when the two were in Kansas City pawning some of the stolen jewelry.

On April 2, 1993, the Circuit Court of Greene County issued an indictment charging Hall with one count of first-degree murder. Trial for the first-degree murder charge commenced on September 6, 1994. At trial Hall testified that he went to White's store to retrieve three watches he had left there a few days earlier. Hall said White told him the watches were worthless and that he threw them away. Hall testified that he did not believe White and moved around the store counter demanding that White return the watches. Hall said White then pulled a gun from a desk drawer, the two men struggled, Hall pushed White's hand back, and the gun went off lodging a bullet in White's head.

## II. STANDARDS OF REVIEW

■ We review the evidence presented at trial in a light most favorable to the verdict. *State v. Storey,* 901 S.W.2d 886, 891 (Mo. banc 1995). The trial court is vested with broad discretion to admit and exclude evidence at trial. Error will be found only if this discretion was clearly abused. *State v. Simmons,* 955 S.W.2d 729, 737 (Mo. banc 1997), *cert. denied* — U.S. ——, 118 S.Ct. 1081, 140 L.Ed.2d 138 (1998).

■ On direct appeal we review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Morrow,* 968 S.W.2d 100, 105–06 (Mo. banc 1998), *cert. denied* — U.S. ——, 119 S.Ct. 222, 142 L.Ed.2d 182; *State v.*

*Hutchison,* 957 S.W.2d 757, 761 (Mo. banc 1997); *State v. Skillicorn,* 944 S.W.2d 877, 884 (Mo. banc 1997), *cert. denied* — U.S. ——, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997). Issues that were not preserved may be considered only if the court finds that manifest injustice or a miscarriage of justice has resulted from the trial court error. *Simmons,* 955 S.W.2d at 737.

■ Our review of Hall's post-conviction claims is limited to whether the motion court clearly erred in finding that Hall's counsel was not ineffective. Rule 29.15(j); *Storey,* 901 S.W.2d at 900. To prove ineffective assistance of counsel, Hall must show that (1) counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney, and (2) Hall's defense was prejudiced by his counsel's poor performance. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Simmons,* 955 S.W.2d at 746; *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996), *cert. denied* — U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

■ In evaluating the performance of counsel under the first prong of the *Strickland* test, we note that actions by counsel that constitute sound trial strategy are not grounds for ineffective assistance claims. *Simmons,* 955 S.W.2d at 746; *Storey,* 901 S.W.2d at 893. There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. 2052; *Simmons,* 955 S.W.2d at 746.

■ Even if counsel is found to have performed deficiently, the second prong of the *Strickland* test requires us to ask whether Hall was prejudiced by his counsel's poor performance. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Simmons,* 955 S.W.2d at 746. To prove prejudice, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See State v. Harris,* 870 S.W.2d 798, 809 (Mo. banc 1994), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994) (noting that in a 29.15 proceeding, trial

counsel's actions will be found to result in prejudice only if they were outcome-determinative); *State v. Shurn*, 866 S.W.2d 447, 468 (Mo. banc 1993), *cert. denied* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994) (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

## III. ISSUES OF ALLEGED TRIAL COURT ERROR

Hall asserts that the trial court erred by: 1) excluding evidence of White's character and evidence suggesting White bought a gun from Hall; 2) refusing to tender a jury instruction on the lesser offense of second-degree felony murder; 3) overruling Hall's motion for a change of venue; 4) allowing the prosecutor to use inappropriate statements in his closing arguments; 5) overruling Hall's motion to prevent the death penalty; and 6) requiring Hall to appear in shackles during the penalty phase. None of Hall's allegations of trial court error possess merit.

### A.Suppression of Evidence

Hall raises two evidentiary issues. Hall asserts that the trial court improperly refused to allow him to introduce evidence that White had a reputation for "ripping people off," and the trial court improperly refused to allow Hall to introduce evidence that White had purchased a gun from a man named "Donnie."

### 1. White's Character Evidence

Hall claims that the trial court improperly excluded Otis Glenn's testimony that White had a reputation for dealing in stolen goods and for "ripping people off." Hall claims that the trial court's exclusion of this evidence deprived him of his constitutional right to present a defense.

█ Hall failed to preserve his constitutional claim for appeal. "To preserve appellate review, constitutional claims must be made at the first opportunity, with citations to specific constitutional sections." *State v. Chambers*, 891 S.W.2d 93, 103–04 (Mo. banc 1994).

█ Hall argues that this character evidence was admissible to establish his state of mind when he walked around White's jewelry counter. Hall claims he went to White's store to retrieve watches he had left there a few days earlier; that White told him the watches were worthless and that he threw them away; that he then approached White by moving around the store counter; and he told White he wanted his watches back. Hall asserts that evidence of White's reputation for dealing in stolen goods would have refuted the state's theory that Hall moved around the counter to deliberately attack White.

█ Evidence of the victim's character is generally inadmissible except in specific instances. *State v. Waller*, 816 S.W.2d 212, 214 (Mo. banc 1991). When the defendant asserts self-defense a victim's reputation for violence is generally admissible on the question of who is the aggressor. *Waller*, 816 S.W.2d at 216. However, in *Waller*, we noted that the specific acts of violence "must be of a quality such as to be capable of contributing to the defendant's fear of the victim...." *Waller*, 816 S.W.2d at 216.

The evidence that Hall tried to introduce through Glenn's testimony was not evidence of White's reputation for violence and was not relevant to whether Hall might reasonably have feared White, regardless of why Hall moved around the counter. *See Harris*, 870 S.W.2d at 809. The trial court did not abuse its discretion by rejecting the evidence. Point denied.

### 2. Evidence that White Purchased a Gun from "Donnie"

█ Hall complains that he was not allowed to introduce the testimony of Tony Jenkins that, about three weeks before White's death, White told Jenkins that he wanted to buy a gun and asked Jenkins to find him a gun. Jenkins also would have testified that two weeks later, White told Jenkins that he no longer needed a gun because he had purchased one "from somebody named Donnie." The gun used to shoot White was owned by Donald Hall. Hall asserts that Jenkins' testimony explains why a gun owned by Hall was in White's possession and supports his defense that White first pointed a gun at him.

Hall does not allege that Jenkins' testimony properly falls within a hearsay exception. Hall claims that the trial court's exclusion of

this evidence deprived him of his constitutional right to present a defense. Hall, however, failed to preserve his constitutional claim for appeal. "To preserve appellate review, constitutional claims must be made at the first opportunity, with citations to specific constitutional sections." *Chambers*, 891 S.W.2d at 103–04. Jenkins' testimony was hearsay and the trial court did not abuse its discretion by rejecting this evidence. Point denied.

## B. Jury Instruction

Hall asserts the trial court erred by refusing to submit to the jury an instruction for the offense of second-degree felony murder. "Under section 556.046.2, RSMo 1986, the trial court is obligated to charge the jury with respect to a lesser included offense when there is a basis for a verdict acquitting him of the offense charged and convicting him of the included offense." *State v. Kinder*, 942 S.W.2d 313, 330 (Mo. banc 1997), *cert. denied* —— U.S. ——, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997).

We have consistently held that when "a jury convicts on first-degree murder after having been instructed on both first degree and second-degree murder, there is no prejudice to the defendant by the refusal to submit a second degree felony murder instruction." *Kinder*, 942 S.W.2d at 330; *see, e.g., State v. Roberts*, 948 S.W.2d 577, 603 (Mo. banc 1997), *cert. denied* —— U.S. ——, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998); *State v. Wise*, 879 S.W.2d 494, 517 (Mo. banc 1994), *cert. denied* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *State v. Six*, 805 S.W.2d 159, 164 (Mo. banc 1991), *cert. denied* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). The trial court did not err. Point denied.

## C. Denial of Motion for Change of Venue

Hall next asserts that the trial court erred when it overruled his motion for change of venue. Hall claims that extensive publicity surrounding the case in Greene County prevented him from receiving a fair trial. Hall asserts that newspaper articles, including one printed on the morning his trial began reporting that Hall had previously been tried for murder and acquitted, unduly influenced the inhabitants of Greene County and prevented him from receiving a fair trial.

Rule 32.04(a)(1) provides that a change of venue may be ordered in a criminal jury trial if the inhabitants of the county in which the trial is to take place are prejudiced against the defendant. "The decision to grant or deny a change of venue for cause is a matter of trial court discretion, and its ruling will not be reversed absent an abuse of discretion. . . . A trial court abuses its discretion when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur there." *Kinder*, 942 S.W.2d at 323.

The record reflects that each veniremember who had heard of the case in the media was carefully questioned. Several veniremembers were removed for cause because their answers reflected that they had formed an opinion about Hall's guilt because of their exposure to the media reports. Hall cannot point to any specific juror who had fixed opinions about Hall's guilt and threatened his right to a fair trial. *See Kinder*, 942 S.W.2d at 323–24. The trial court did not abuse its discretion by denying Hall a change of venue. Point denied.

## D. Closing Arguments

Hall claims the trial court erred because it permitted improper closing arguments during the guilt and penalty phases of the trial.

### 1. Guilt–Phase Statements

During the guilt phase, Hall complains that the prosecutor: 1) suggested that Hall fabricated his testimony after he sat in court for a week and heard the state's evidence; 2) stated that "If this is not deliberation, I don't know what would be deliberation;" 3) went outside the evidence to personally vouch for the credibility of a state's witness; and 4) suggested that Hicks was a battered spouse. Hall claims these statements are grounds for reversal because they: 1) invited the jury to use Hall's exercise of his right to testify as evidence of his guilt; 2) implied that the prosecutor believed that the evidence of de-

liberation was stronger here than in his past cases; 3) included the prosecutor's personal knowledge to vouch for the state's witnesses; and 4) implied that the prosecutor knew that Hall was guilty of other, uncharged offenses.

 In the first three of the four statements Hall complains of, Hall failed to object to the statements at trial and therefore failed to preserve his arguments for appellate review. Thus for those three statements, reversal is only required upon a finding of plain error. *Simmons*, 955 S.W.2d at 737. "A court should rarely grant relief on assertions of plain error at guilt-phase closing" arguments. *Storey*, 901 S.W.2d at 897. "Plain error review also requires that the argument have a decisive effect on the jury's determination." *State v. Shurn*, 866 S.W.2d 447, 460 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994).

 The prosecutor stated that Hall has had to adapt and improvise as the trial has gone on, after he has seen the evidence.... But we discover this isn't the first story he's told.... The first story he cooked up about a month after the crime was, "I walked into the shop and found him dead and panicked and grabbed this stuff and ran, and Donna never went into the store." Well, which story is it?

He sat in here for a week and found out that story wouldn't fly, so now we hear that it was self-defense or an accident. "The prosecutor may comment on the evidence and the credibility of the defendant's case." *State v. Kreutzer*, 928 S.W.2d 854, 872 (Mo. banc 1996), *cert. denied* — U.S. —, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). In *Kreutzer*, we noted that "[c]ounsel may even belittle and point to the improbability and untruthfulness of specific evidence." The prosecutor's argument here suggested that Hall offered a theory of self-defense because Hall realized that the evidence overwhelmingly established that he shot White. The trial court did not err by permitting this comment.

 The prosecutor's statement: "If that is not deliberation, I don't know what would be deliberation," is an acceptable statement during closing arguments. In *Roberts*, 948 S.W.2d at 594, we held that the prosecutor's closing statement that "[t]his is as brutal a murder as ever occurred in St. Louis County," was improper. Unlike the statement in *Roberts*, the prosecutor's statement here does not imply that the prosecutor is comparing his knowledge of past cases to the facts in Hall's case to determine that Hall is more brutal or deliberate a murderer than the prosecutor has charged in past cases. The prosecutor simply argued that Hall deliberated before killing White. The trial court did not err by permitting this comment.

 During guilt-phase closing arguments, defense counsel suggested that State's witness Kimball Morton lied about White's murder in order to get out of jail early. Hall's attorney stated:

And then he [Morton] held out just one time too long and said, "I'm not coming over there unless you let me out of jail." And then the state decided to deal with him yesterday. They reached a settlement and I believe the agreement was that they would write the parole board. He still is going to get out early, and so he did have something to gain, something other than the thousand dollars he received, he will be leaving the penitentiary early.

 In his rebuttal, the prosecutor stated during closing argument:

Am I telling you that Kimball Morton is a saint? Nope. Am I telling you that Kimball Morton might not like to benefit financially for sharing the truth? Nope. But I can tell you one thing, there's been no deals cut other than what he told you. I'm not going to let him loose.

Hall claims that the prosecutor's comment went outside of the evidence to vouch for his own personal integrity, Morton's credibility as a witness and the strength of the state's case. The prosecutor's statement was proper retaliation for defense counsel's closing argument, which suggested that Morton received a reduced sentence in exchange for testifying for the state. "A defendant may not provoke reply to his own argument and then assert error." *Kreutzer*, 928 S.W.2d at

875. The prosecutor's comment was not improper.

 During closing arguments, Hall's counsel argued that Hicks was not a crédible witness because she was a liar and because her memory had been impaired by drug use and electric convulsion therapy. In his closing argument, the prosecutor rebutted as follows:

> She [defense counsel] wants to talk about [Hicks] having all these problems, she's a classic battered spouse. I'm not saying she's perfect and I'm not –

Hall's counsel objected on the grounds that there was no evidence that Hicks was a battered spouse. The trial court sustained the objection.

Hall now asserts that a mistrial should have been granted *sua sponte* because the prosecutor went outside the evidence to give the jury information of an uncharged offense. Hall contends that the prosecutor's use of the term "battered spouse" implied that Hall had been convicted of abusing Hicks. Hall argues that the comment also implies that the prosecutor knew more about the case than the jury knew, including that Hall was guilty of other crimes.

The fact that Hall's objection was sustained was sufficient to correct any error in the comment. *State v. Basile*, 942 S.W.2d 342, 351 (Mo. banc 1997). Hall fails to establish that any manifest injustice resulted from the prosecutor's statement that would entitle him to a mistrial. *State v. Shurn*, 866 S.W.2d 447, 461 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). Points denied.

### 2. Penalty–Phase Statement

 During the penalty phase, the prosecutor asked the jury to "be like Brenda Craig Wells, do what is right in this case." Brenda Craig Wells testified during the penalty phase that on April 24, 1981, Hall came to her house claiming to be interested in her garage sale, but then held a gun to her stomach and tried to force her into her house. Wells testified that she grabbed the gun out of Hall's hand and said, "Now I'm going to have to kill you." Wells said Hall took the gun back from her, ran to his car,

and drove away. Wells memorized Hall's license plate number and called the police. As a result of the incident Hall was convicted of displaying a deadly weapon in a rude, angry and threatening manner.

Hall failed to object to this statement at trial and, therefore, failed to preserve his argument for appellate review. Reversal is only required upon a finding of plain error. *Simmons*, 955 S.W.2d at 737. To warrant reversal, plain error requires that the argument have a decisive effect on the jury's determination. *Shurn*, 866 S.W.2d at 460.

 Evidence of past crimes is admissible during the penalty phase of a criminal trial. *State v. Brown*, 902 S.W.2d 278, 291–92 (Mo. banc 1995), *cert. denied* 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995). Further, the prosecutor "is allowed to argue that the jury should send a message that criminal conduct will not be tolerated." *Phillips*, 940 S.W.2d at 520; *see also Roberts*, 948 S.W.2d at 594–95 ("A prosecutor may argue the need for strong law enforcement, the prevalence of crime in the community, and that conviction of the defendant is part of the jury's duty").

The trial court did not err by permitting this statement. Point denied.

### E. Aggravating Circumstance/Avoiding Arrest

Hall asserts that the trial court erred by submitting an improper aggravating circumstance to the jury. Aggravating circumstance #4 allowed the jury to consider "whether the murder of William R. White was committed for the purpose of avoiding a lawful arrest of defendant." Hall claims this aggravating circumstance is unconstitutionally vague and the consideration of this factor would require a finding of an aggravating circumstance in every murder case, because the murder always ensures that the victim will be unable to identify the killer.

 "Under the present Missouri capital sentencing scheme, the sentencer ... must find that one or more statutory aggravating circumstances exist beyond a reasonable doubt." *State v. Carter*, 955 S.W.2d 548,

559 (Mo. banc 1997), *cert. denied* —— U.S. ——, 118 S.Ct. 1374, 140 L.Ed.2d 522 (1998). The jury found two aggravating circumstances existed in the evidence at trial. In addition to the circumstance Hall takes issue with, the jury found that Hall committed the murder for the purpose of receiving money or any other thing of monetary value. The evidence introduced at trial revealed that Hall took jewelry and White's wallet from the store after he shot White and pawned several pieces of the jewelry a short time after the murder. This aggravating circumstance alone was sufficient for the jury to recommend that Hall be sentenced to death. *See Carter*, 955 S.W.2d at 559.

 Even if the jury had found only the aggravating circumstance challenged by Hall, that circumstance is not unconstitutional as applied in this case. Hicks testified that Hall told her several times that he killed White because "the only good witness is a dead witness." The facts of this case clearly support a finding that Hall murdered White to avoid being arrested for the robbing of White's store. Point denied.

### F. Leg and Waist Shackles

 Hall asserts that the trial court erred by overruling his objection to wearing leg and waist shackles during the penalty phase. This issue was decided in *Kinder*, 942 S.W.2d at 330. The trial court did not err by overruling Hall's objections. Point denied.

## IV. ISSUES OF ALLEGED MOTION COURT ERROR

Hall claims the motion court erred by failing to find that his trial counsel was ineffective. Hall complains his counsel was ineffective because she: 1) failed to effectively impeach state's witnesses; 2) failed to produce an effective defense; and 3) failed to object to the prosecutor's closing argument. Hall also asserts that the motion court failed to make findings of fact and conclusions of law on all issues raised in his motion.

### A. Failure to Impeach State's Witnesses

Hall claims that his trial counsel was ineffective for not impeaching Donna Hicks with some of her prior inconsistent statements and with other available evidence. Hall also asserts his trial counsel was ineffective for failing to establish that Hicks was incompetent to testify, and for failing to impeach scene witness Charles Ingram.

#### 1. Impeachment of Hicks

There is no doubt that Hicks was a key witness for the state. She testified that Hall returned to the car from White's jewelry store with bloody hands and stolen jewelry. She also testified that Hall said he shot White in the head and that he did it because the only good witness is a dead witness.

At trial, Hall's counsel cross-examined Hicks. Hall's counsel obtained an admission from Hicks that, although she testified that Hall was away from the car for ten minutes, she had previously told police that Hall was away from the car for just a few seconds. Hall's counsel forced Hicks to admit that she was using "a lot of cocaine" for at least two weeks prior to the day of the crime and that she had previously falsely denied using drugs. Hall's counsel also elicited admissions from Hicks that she has been treated by health professionals, has undergone electroshock therapy, and has used Prozac.

Hicks also admitted on cross-examination that she initially went to the press rather than the police with information about the murder, and that she did not give the police all the jewelry from White's shop at once. Hall's counsel also asked Hicks about statements she had allegedly made claiming she was testifying against Hall because of his relationship with Laura Loveless. Hall's counsel suggested during cross-examination that Hicks was testifying against Hall in exchange for immunity from prosecution for receiving stolen jewelry.

When Hicks denied that she had been in contact with Hall since his arrest and claimed that she was afraid of him, Hall's counsel introduced the testimonies of witnesses claiming Hicks had in fact been in contact with Hall. Hall's counsel also questioned Hicks about statements she made during her

videotaped statement to the police, suggesting that Hicks knew several details about the crime and, therefore, played a more direct part in it.

Hall claims his counsel did not go far enough. He claims she was ineffective because she should have cross-examined Hicks with the pretrial videotaped statement in which Hicks stated that Hall planned only to break in and steal from White's store when White was not there; in short, to commit a "burglary," not a "robbery." Hall contends this would have shown that he had no predisposition to kill White and would have supported his version of the facts.

 "The manner in which cross-examination is conducted, and the extent of cross-examination, are matters of trial strategy best left to the judgment of trial counsel." *Kinder*, 942 S.W.2d at 335. At the evidentiary hearing, Hall's counsel testified that she considered Hall's case to be a two-witness trial, with the essential witnesses being Hall and Hicks. Counsel further testified that Hicks' trial testimony was, for the most part, consistent with her videotaped testimony. In the videotape, Hicks explains the crime in detail. It was not unreasonable for Hall's counsel to conclude that more harm than benefit would come from its use at trial. The motion court did not err. Point denied.

### 2. Additional Evidence to Impeach Hicks

 Hall also claims his trial counsel was ineffective for choosing not to introduce a letter allegedly sent to Hall by Hicks. Hall claims the letter should have been used to impeach Hicks' testimony that she had not contacted Hall since his arrest. Hall's counsel called John Mahan, Agnes Carpenter, and LeRoy Carpenter to impeach Hicks' testimony that she had not contacted Hall while he was awaiting trial. Therefore the motion court found that the letter from Hicks to Hall would have been cumulative evidence, and trial counsel will not be found ineffective for failing to present cumulative evidence. *Kinder*, 942 S.W.2d at 336. The motion court did not err in finding that Hall's counsel was not ineffective for failing to introduce this letter. Point denied.

 Hall also complains that his counsel should have introduced the testimony of Laura Loveless. Hall claims that Hicks was angry because Loveless was having an affair with Hall. Hall claims Loveless would have testified that Hicks threatened her during the trial, making her afraid to testify on Hall's behalf. Loveless testified at the evidentiary hearing but did not testify in the manner in which Hall claims she would have testified had she been called at trial. Loveless testified that she and Hicks had verbal arguments but that she was not afraid of Hicks and that she did not remember Hicks threatening to harm her if she testified for Hall. The motion court did not err by finding that Hall's counsel was not ineffective for failing to call Loveless as a defense witness. Point denied.

 Hall also complains his counsel was ineffective for failing to call Curt Hough as a defense witness. Hough testified at the evidentiary hearing that Hicks did not tell Hough that she was lying to the police about the facts surrounding White's murder. Hall's trial counsel explained that she did not call Hough as a witness because he was not prepared to say that Hicks lied, and because he did not want to testify. The motion court did not err in finding that Hall's counsel was not ineffective for failing to call Hough as a defense witness. Point denied.

### 3. Pretrial Motion to Bar Hicks' Testimony

 Hall also asserts that his trial counsel was ineffective for failing to competently litigate a pretrial motion to bar Hicks' testimony on the grounds that she was not competent to testify. Hall's counsel filed a motion to suppress Hicks' testimony, alleging that Hicks was incompetent to testify because of drug use and treatments for mental disorders. The trial court overruled that motion. At Hall's trial, his counsel called two doctors to the stand to testify about Hicks' drug use and about her exposure to electroconvulsive therapy and drug treatment for mental disorders.

At the evidentiary hearing Hall produced testimony of doctors who evaluated Hicks,

but Hall was unable to establish through their testimony that Hicks was not competent to testify. Dr. Rose Buckner, a clinical psychologist, conducted a clinical interview and administered psychological evaluations to Hicks in August 1993. Dr. Buckner testified that Hicks suffered from depression and anxiety, but that she was not psychotic or in any way out of touch with reality. Dr. Shirley Taylor reviewed Dr. Buckner's report. Both Dr. Buckner and Dr. Taylor testified that Hicks' evaluation could not predict whether Hicks had lied or was likely to lie during Hall's trial. The motion court did not err in finding that Hall's counsel was not ineffective for failing to call these expert witnesses. Point denied.

### 4. Impeachment of Scene Witness Charles Ingram

Hall claims that the motion court erred by failing to find that trial counsel was ineffective for not impeaching scene witness Charles Ingram with his pretrial inconsistent statement. Ingram testified at trial that he saw Hall in the vicinity of White's shop between 10:30 and 11 a.m. Ingram told police prior to trial that he believed he saw Hall in the vicinity of White's shop around 11:55 a.m.

 Failure to impeach a witness does not automatically entitle Hall to post-conviction relief. *See Phillips*, 940 S.W.2d at 522. Hall must establish that the impeachment of Charles Ingram would have provided him with a defense to the crime of first-degree murder, or that it would have changed the outcome of the trial. *Phillips*, 940 S.W.2d at 522. In establishing this, Hall must overcome the presumption that trial counsel's decision not to impeach was a matter of reasonable trial strategy. *Phillips*, 940 S.W.2d at 522; *State v. Twenter*, 818 S.W.2d 628, 640 (Mo. banc 1991) ("if [a] prior inconsistent statement by a state's witness does not give rise to a reasonable doubt as to defendant's guilt, such impeachment evidence is not the basis for a claim of ineffective assistance of counsel.").

 Hall's counsel testified at the evidentiary hearing that she believed that Ingram's inconsistency was irrelevant because Hall testified that he was in White's store and

that he shot White; therefore, Ingram's testimony placing Hall at the scene of the murder was not necessary to the state's case. Hall's argument that this inconsistency would have reinforced his version of the facts is too remote and speculative to establish either ineffective assistance of counsel or prejudice. The motion court found that Hall's counsel practiced sound trial strategy in choosing not to cross-examine Ingram on his prior inconsistent statement. The motion court did not err. Point denied.

### B. Claims of Failure to Produce Effective Witnesses

Hall asserts his counsel was ineffective for 1) failing to call certain experts to testify about blood and gunpowder evidence; 2) failing to rebut a state's witness; and 3) failing to call Hall's relatives as penalty phase witnesses.

### 1. Expert Testimony

 Hall claims his counsel was ineffective when she failed to present expert testimony that the blood evidence and gunpowder evidence were inconsistent with Hicks' account of the shooting. Hall asserts that the expert testimony of Dr. Jay Dix would have corroborated Hall's testimony and discredited Hicks' testimony. Hall claims that expert testimony and lab reports would have established that the amount of blood pooled on White's chair and the gunpowder residue on White's hand would support Hall's account of what happened after he shot White.

Dr. Dix testified at the evidentiary hearing. Dr. Dix's analysis of the evidence was that White died in his chair and that he was in the chair long enough for blood to accumulate on the seat of the chair. Dr. Dix also concluded that the gunshot residue test indicated that White's right hand was near the gun when it was fired. Dr. Dix could not tell whether there was a struggle and he could not calculate the positions of Hall and White at the time the shot was fired. The motion court found that Dr. Dix was unable to support Hall's testimony that White was shot accidentally and during a struggle. The motion court therefore concluded that the outcome of Hall's trial would not have been

different had Dr. Dix testified. The motion court did not err in its finding. Point denied.

### 2. Rebuttal of State's Witness Kimball Morton

■■ Hall also asserts that his trial counsel was ineffective for failing to call Hall as a witness to rebut Kimball Morton's testimony. The record directly refutes Hall's assertion. First, trial counsel did in fact call Hall as a witness to rebut Morton's testimony. Second, elsewhere in Hall's motion, Hall asserts that his trial counsel "forced" him to testify because she failed to call other defense witnesses, and that Hall did not understand that he had a right not to testify. The motion court directly addressed the issue of Morton's testimony and of Hall's voluntary decision to testify. The motion court did not err by finding that Hall's counsel did allow Hall to rebut Morton's testimony. Point denied.

### 3. Penalty Phase Witnesses

■■ Hall asserts that his trial counsel was ineffective by failing to call Hall's father and brothers to testify during the penalty phase of Hall's trial. Charlie Mooney, Hall's father, testified at the evidentiary hearing that he was not closely acquainted with Hall. He testified that he was aware Hall was to be on trial, but he did not know when or the nature of the charges against Hall. He testified that he was in Mexico at the time of Hall's trial and did not try to attend Hall's trial or sentencing. The attorney representing Hall during the penalty phase testified that Charlie Mooney and his wife told her that they would be of no help to Hall because Hall had been away from the family for a very long time.

Hall's brother Jeff Mooney testified at the evidentiary hearing that he lived in Missouri at the time of Hall's trial, he knew Hall was on trial for murder, and that he made no attempt to contact Hall or Hall's trial counsel. Hall's brother Kelley Mooney testified that he was living in Missouri at the time of Hall's trial but he did not know there was a trial and did not know Hall was charged with first-degree murder.

The motion court recognized that Hall's father and brothers appeared to be productive citizens with stable employment, but the court also noted that they were not close to Hall. The motion court further noted that at the penalty phase Hall's trial counsel called other witnesses to testify on behalf of Hall. LeRoy Carpenter testified that he and Hall had been in prison together and that he had been out of prison for eleven years and had not been rearrested. Carpenter stated that he and Hall maintained a close friendship and asked the jury to spare Hall's life. John Mahan, Hall's son, testified that he and Hall were close and asked the jury to spare Hall's life.

Missouri law does not impose on trial counsel an absolute duty to present mitigating character evidence during the penalty phase of trial. *Schneider v. State*, 787 S.W.2d 718, 721 (Mo. banc 1990), *cert. denied* 498 U.S. 882, 111 S.Ct. 231, 112 L.Ed.2d 186 (1990); *Jones v. State*, 767 S.W.2d 41, 44 (Mo. banc 1989), *cert. denied* 493 U.S. 874, 110 S.Ct. 207, 107 L.Ed.2d 160 (1989). The motion court properly found that Hall's trial counsel met her obligation to investigate possible mitigating circumstances. Hall's counsel presented evidence she believed would be most beneficial to Hall. The motion court did not err in finding that counsel's decisions regarding evidence to present during the penalty phase constituted sound trial strategy. *Schneider*, 787 S.W.2d at 721. Point denied.

### C. Failure to Object to State's Closing Argument

■■ Hall also claims that his counsel was ineffective for failing to object to the prosecutor's guilt-phase closing argument. During his closing argument, the prosecutor stated that:

> on December 15, 1992 the defendant, at 10:30 in the morning, goes down to that store to case it out. Charlie Slater tells you that. Why does he remember 10:30? He's had to drive his friend Ingram to work, and Slater had to be to his job. He was already late. That's why he looked at his watch. He was already running late. That's why 10:30 sticks in his mind.

Hall argues that his trial counsel was ineffective because she failed to object to the

prosecutor's mention of Slater looking at his watch, because Slater did not in fact testify that he had looked at his watch at 10:30 a.m.

 Objections during closing argument are considered a function of trial strategy. *See State v. Wood,* 719 S.W.2d 756, 759–60 (Mo. banc 1986). Even if the evidence did not strictly support this statement, it was not so inconsistent with the other evidence in the record to have constituted ineffective assistance or prejudice. The motion court did not err in finding that counsel's decision not to object to the prosecutor's closing argument was sound trial strategy that did not prejudice Hall's defense. Point denied.

### D. Findings of Fact and Conclusions of Law on All Issues

Finally, Hall asserts that the motion court inappropriately overruled Hall's post-conviction motion without making findings of fact and conclusions of law on all claims raised as required by Rule 29.15(j). Hall claims the motion court failed to address the issue of whether trial counsel was ineffective for failing to call Laura Loveless as a defense witness to rebut the testimony of Morton.

 "An appellate court will not order a useless remand to direct the motion court to enter a proper conclusion of law on an isolated issue overlooked by the motion court where it is clear that movant is entitled to no relief as a matter of law...." *White v. State,* 939 S.W.2d 887, 903 (Mo. banc 1997), *cert. denied* —— U.S. ——, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997); *see State v. Stallings,* 812 S.W.2d 772, 779 (Mo.App.1991). Here, the motion court entered a thorough and detailed fifty-one page judgment rejecting Hall's 29.15 claims. The judgment ruled on all pertinent matters raised and specifically discussed the issue regarding Loveless' testimony.

At the evidentiary hearing Loveless testified that she received a subpoena for Hall's trial and she came to the courthouse but that she became ill and left before the trial started. The motion court discussed Loveless' testimony in its ruling and found that her testimony would not have provided Hall with a defense. Contrary to Hall's assertion, the

motion court complied with 29.15(j) on this issue. *Motion Court Judgment,* Legal File Vol. III, paragraph 9, pp. 6–7. Point denied.

## V. STATUTORY REVIEW

Section 565.035 requires us to independently review the sentence of death to determine (1) whether it was imposed under the influence of passion or prejudice, or any other arbitrary factor; (2) whether there was sufficient evidence to support the finding of a statutory aggravating circumstances and any other circumstance found; and (3) whether the sentence was excessive or disproportionate to the penalty imposed in similar cases.

There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We review the trial court's findings to determine if the evidence supports–beyond a reasonable doubt—the existence of an aggravating circumstance and any other circumstance found. Section 565.035.3(2); *State v. Brown,* 902 S.W.2d 278, 294 (Mo. banc 1995).

Hicks testified that when Hall returned from White's shop he was carrying a sack of jewelry and had blood on his hands. A few days later, Hall pawned the stolen jewelry for cash. Morton testified that Hall talked to him about "going in there and robbing and killing Bill White." Hall told Morton that "[a]ll they would have to do is walk in there and shoot him in the head" and then steal his jewelry and money. The evidence overwhelmingly establishes that Hall was engaged in the perpetration of a robbery when he murdered White. *See* section 565.032.2(4). Hall's statement that "the only good witness is a dead witness" supports the finding that Hall murdered White to ensure that White could not testify against him. *See* section 565.035.2(9).

The evidence presented by the state also supports, beyond a reasonable doubt, the jury's findings that: Hall was convicted of burglary and grand stealing in 1965; Hall was convicted of displaying a dangerous and deadly weapon in 1969; Hall was convicted of exhibiting a deadly weapon in a rude, angry and threatening manner in 1981; Hall was

convicted of second-degree burglary in 1981; and Hall was convicted of receiving stolen property in 1986.

In determining whether the sentence of death is excessive or disproportionate, we are to consider "the crime, the strength of the evidence and the defendant." Section 565.035.3(3).

We have found a sentence of death appropriate when the crime to be considered is a murder committed during the course of a robbery. *See, e.g., State v. Skillicorn,* 944 S.W.2d 877 (Mo. banc 1997), *cert. denied,* — U.S. ——, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997); *State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993); *State v. Kilgore,* 771 S.W.2d 57 (Mo. banc 1989), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); *State v. Wise,* 879 S.W.2d 494 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995).

The strength of the evidence and Hall's violent record support a sentence of death. Two witnesses saw Hall walking towards White's store on the morning of the murder. The gun used to kill White belonged to Hall. Hicks testified that Hall returned from White's shop with blood on his hands and told her he "blew the man's brains out." A photograph reveals that Hall wore one of the rings that he took from White for several days after the murder, until he was arrested for an unrelated drug charge.

Hall's criminal record is peppered with a history of using guns to threaten and intimidate innocent people. Brenda Craig Wells testified during the penalty phase that on April 24, 1981, Hall came to her house claiming to be interested in her garage sale, but then held a gun to her stomach and tried to force her into her house. As a result of the incident Hall was convicted of displaying a deadly weapon in a rude, angry, and threatening manner. James Williams testified that on April 5, 1981, he came home to find his front door open, his house ransacked, and Hall in the act of climbing over his patio fence. Hall fired a shot at Williams. Hall was convicted of second-degree burglary. Harvey Rector, a retired Springfield police officer, testified that on May 6, 1969, Hall pointed a rifle at him and said he was going to kill a cop. Hall was convicted of displaying a dangerous and deadly weapon.

Hall's sentence is neither excessive nor disproportionate.

## VI. CONCLUSION

The judgments are affirmed.

All concur.