Terrance WAINWRIGHT, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 62823.

Missouri Court of Appeals,
Western District.

Sept. 14, 2004.

Andrew A. Schroeder, Kansas City, MO, for appellant.

Deborah Daniels, Assistant Attorney General, Jefferson City, MO, for respondent.

Before JOSEPH M. ELLIS, Presiding Judge, PATRICIA BRECKENRIDGE, Judge and THOMAS H. NEWTON, Judge.

JOSEPH M. ELLIS, Presiding Judge.

Terrance Wainwright appeals from the denial of his Rule 29.15 motion for post-conviction relief without an evidentiary hearing. Appellant was convicted of one count of first-degree murder, § 565.020, one count of first degree assault, § 565.050, and two counts of armed criminal action, § 571.015, for the killing of his step-daughter and the shooting of his step-son. Appellant was sentenced to consecutive terms of life without the possibility of parole on the first-degree murder conviction and thirty years on each of the other three convictions. For the following reasons, we reverse and remand for an evidentiary hearing.

In December 1996, Appellant moved from California to Raytown, Missouri, to live with his future wife, Jo Ann Wainwright, after the couple had been reunited at their 20-year high school reunion. Jo Ann had two children, Candice Bruner, who was fifteen-years-old, and Terry McGee, Jr., who was ten-years-old. Both children lived with the couple. In March 1997, Appellant and Jo Ann were married.

Prior to December 3, 1997, Jo Ann informed Appellant that she wanted a divorce because she was no longer in love with him and her children were not getting along with him. On December 3, 1997, Appellant told Ernest Hicks, one of Appellant's friends at work, that Jo Ann wanted a divorce and about the problems he had been having at home.

On December 4, 1997, Appellant showed Hicks a gun at work and told Hicks that the gun had jammed the previous night when he had tried to shoot Jo Ann and that he was getting it fixed. He then told Hicks that he was going to try to get on with his life and possibly move back to California.

About midnight that evening, Appellant beat and shot Jo Ann multiple times, ultimately killing her. Appellant also beat and stabbed Candice with a kitchen knife and then shot her. She died shortly thereafter as a result of those wounds. Appellant then went to Terry, Jr.'s bedroom where Terry Jr. was hiding under the covers. Appellant pulled off the covers, said he was sorry, and shot Terry Jr. in the shoulder.

Later that evening, Appellant went to the Kansas City, Missouri, police department with his brother and surrendered himself to the police. When he came into the lobby, Appellant told officers that he had just killed his family. When Sgt. Darrell Rocker and Officers Clark and Scheer approached Appellant, he told them that he had "just lost it" and that he had possibly killed his wife, his fifteen-year-old daughter and ten-year-old son. When Sgt. Rocker asked Appellant's brother if he was serious, Appellant's brother responded, "Yes, we're serious or we wouldn't be here." Appellant then held up his hands, which had dried blood on the palms and fingers. Appellant gave the officers his address and told them that he had left the door open.

The officers did not ask any further questions and placed Appellant in custody while they contacted the Raytown Police Department to determine if anything had happened at Appellant's residence. Appellant showed the officers a cut on his stomach but declined the officers' offer of medical attention. During his interaction with the Kansas City police officers, Appellant appeared calm and spoke quietly.

Raytown police officers went to Appellant's house and found the door unlocked. When they entered the house, officers found Jo Ann lying dead in the hallway with shell casings on the floor next to her. An autopsy revealed that Jo Ann had suffered blunt force injuries to her head and face and received gunshot wounds to her head, chest, and abdomen. The cause of death was deemed to be from multiple gunshot wounds.

Officers next found Terry McGee Jr. lying in bed, saying "I've been shot." A shell casing was later recovered from the top of the bed. When officers asked Terry if he remembered what happened, Terry responded that he had been home with Appellant, his mother and his sister, and that Appellant had shot them all.

Officers found Candice lying on the floor of her room, covered with blood, between the bed and the closet. They discovered a bloody knife on her bed. DNA tests later revealed the blood to be Candice's. An autopsy of Candice's body revealed multiple knife wounds to her face, skull, body and wrists along with gunshot wounds to the right shoulder, left chest, right chest, and left breast. Her death was determined to have resulted from a combination of gunshot wounds, stab wounds, and blunt instrument wounds to her head.

Blood was found on various items in Candice's closet in a manner that indicated that Candice had been standing in the closet, dripping blood. A bullet hole was discovered on the headboard of the bed and a bullet was recovered from the wall. Two cartridge casings were found in the bed. The pattern of smearing and pooling of blood on the floor indicated that Candice had "been wallowing around in volumes of blood."

In Appellant's bedroom, officers found a phone with blood on it and a .32 caliber pistol on the floor inside the door. There was blood on the pillow, the wall, and the television set. The gun and its magazine were empty. Blood splatters on the wall were consistent with someone having been struck by a fist or blunt object between the bed and the bedroom wall.

The Raytown police reported to the Kansas City police that they had found at least one dead body in Appellant's home. Detectives Larry Hawks and Debbie Snyder of the Raytown Police Department went to the Kansas City Police Department to talk to Appellant. Prior to doing so, they interviewed Appellant's brother and the officers to whom Appellant had surrendered.

The detectives subsequently introduced themselves to Appellant and examined Appellant's person for physical evidence relevant to the crime. They then read Appellant his Miranda rights and asked him if he was willing to talk with them about what had happened, and Appellant indicated that he was willing to talk. Appellant then signed a form waiving his Miranda rights.

In speaking with the detectives, Appellant was cooperative and calm. He appeared to understand everything the officers said and responded appropriately to questions and asked intelligent questions in return. Appellant told the detectives that he had not intended to kill his family but that the "pressure" had "just built up" and that he had "just snapped."

During his interrogation, Appellant told the detectives that he had awakened and heard Jo Ann talking to her ex-husband, Terry McGee, on the telephone at 11:45 p.m. while in the bathtub that night. He claimed that he picked up the receiver and heard them say that they loved each other and that McGee talked about how he wished he was in the bathtub with Jo Ann. He also claimed that Jo Ann and McGee laughed about Appellant's problems with Candice. Appellant claimed that he began beating Jo Ann with the telephone receiver after she got out of the bathtub. He stated that Candice came into the bedroom with a kitchen knife after Jo Ann called to her for help and that Candice had come at him with the knife. Appellant indicated that he did not get out his gun until after Candice cut him with the knife.

Appellant was subsequently charged by indictment in the Circuit Court of Jackson County with two counts of first degree murder, one count of class A felony first-degree assault, and three counts of armed criminal action. A substitute information later charged him with those same crimes as a prior offender.

 Appellant was tried by jury on March 6, 2000. At trial, Appellant's defense against the first degree murder charges was that he suffered from a mental disease or defect that prevented him from being able to deliberate at the time of the murders.[1] After Appellant presented the testimony of four expert witnesses, the State presented the testimony of one witness, Dr. Leo Vlach, a forensic psychiatrist, who testified that Appellant did not have a mental disease or defect that ren-

dered him unable to deliberate at the time of the crime.

The jury ultimately found Appellant guilty on the first degree murder count related to the murder of Candice, one count of first-degree assault for his attack on Terry, and two counts of armed criminal action. The jury was unable to reach a verdict on the first-degree murder charge related to the murder of Jo Ann and the related armed criminal action count, and the trial court declared a mistrial as to those counts. Eventually, the trial court sentenced Appellant as a prior offender to consecutive sentences of life without the possibility of parole on the murder conviction and thirty years on each of the other three convictions.

After Appellant's convictions and sentences were affirmed by this court on appeal, *State v. Wainwright*, 64 S.W.3d 343 (Mo.App. W.D.2002), Appellant timely filed a *pro se* motion for post-conviction relief under Rule 29.15. Appointed counsel filed an amended motion. In relevant part, Appellant claimed that he received ineffective assistance of counsel when counsel did not present the testimony of Dr. Karen Willing, who had previously been retained by the defense and was available to testify at trial, to rebut the testimony offered by the State's mental health expert, Dr. Vlach.

At trial, Dr. Vlach testified that he had his collaborative partner in Appellant's evaluation, Dr. Jackson, give Appellant an MMPI–2 test to make sure that their "hypothesis regarding Mr. Wainwright's personality style was on target" and to make

---

1. "In order to prevail on a diminished capacity defense, a defendant must introduce evidence that he or she suffered from a mental disease or defect[.]" *Nicklasson v. State*, 105 S.W.3d 482, 484 (Mo. banc 2003). "But, the existence of a mental disease o[r] defect will not alone suffice to diminish the defendant's criminal responsibility." *Id.* "The jury must still determine, considering all the evidence, whether the mental disease or defect prevented the defendant from forming the requisite mental state at the time of the offense." *Id.* at 485.

sure they had not missed anything. Dr. Vlach then testified that the results of the test indicated that Appellant suffered from situational stress related to his incarceration and that the results were consistent with the conclusions that Dr. Vlach and Dr. Jackson had made about Appellant.

In his post-conviction motion, Appellant contended that trial counsel was ineffective for failing to utilize the testimony of Dr. Willing in support of their efforts to exclude to Dr. Vlach's testimony from evidence and in failing to use Dr. Willing's testimony to impeach Dr. Vlach's testimony. Appellant asserted that Dr. Willing would have testified that Dr. Vlach and Dr. Jackson had failed to follow the standardized procedures for interpreting the MMPI–2 and had misrepresented the results of the MMPI–2. Finally, Appellant submitted that, had Dr. Willing's testimony been presented to the jury, Dr. Vlach's testimony would have been discredited and the jury would have found that he had a mental disease or defect that prevented him from acting in a premeditated fashion. Eventually, the motion court denied Appellant's motion without an evidentiary hearing.

■ In the sole issue presented in his appeal from the denial of his post-conviction motion, Appellant contends that the trial court erred in denying his motion without an evidentiary hearing. He claims that the trial court improperly found that the averments contained in his motion, even if proven, would not warrant relief.

"Appellate review of the denial of a Rule 29.15 motion is confined to the issue of whether the findings of fact and conclusions of law of the motion court are clearly erroneous." *State v. Weston*, 926 S.W.2d 920, 923 (Mo.App. W.D.1996). "The findings and conclusions are clearly erroneous only if a review of the entire record leaves the appellate court with a definite and firm

impression that a mistake has been made." *Hatcher v. State*, 4 S.W.3d 145, 147 (Mo. App. S.D.1999).

■ The trial court is required to grant an evidentiary hearing on a motion for post-conviction relief if the movant satisfies three requirements: "(1) the movant must plead facts, not conclusions, which, if true, would warrant relief; (2) the facts pled must not be refuted by the record; and (3) the movant must have been prejudiced." *Kuehne v. State*, 107 S.W.3d 285, 292 (Mo.App. W.D.2003). If the movant's motion fails to satisfy all of these requirements, the motion court may properly deny the motion without an evidentiary hearing. *State v. Jones*, 979 S.W.2d 171, 180 (Mo. banc 1998). " 'An evidentiary hearing may only be denied when the record conclusively shows that the movant is not entitled to relief.' " *Ringo v. State*, 120 S.W.3d 743, 745 (Mo. banc 2003) (quoting *Wilkes v. State*, 82 S.W.3d 925, 928 (Mo. banc 2002)).

■ "With respect to claims related to ineffective assistance of counsel, to obtain an evidentiary hearing, the movant must allege facts, not refuted by the record, showing that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that movant was thereby prejudiced." *State v. Brooks*, 960 S.W.2d 479, 497 (Mo. banc 1997); *see also State v. Ferguson*, 20 S.W.3d 485, 505 (Mo. banc 2000). " 'To demonstrate prejudice, Appellant must allege facts showing a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.' " *Ringo*, 120 S.W.3d at 745 (quoting *Wilkes*, 82 S.W.3d at 927–28).

On appeal, Appellant argues that counsel was ineffective for failing to call Dr. Willing to impeach the testimony of Dr.

Vlach. "[I]n order 'to prevail on a claim of ineffective assistance of counsel due to counsel's failure to call a witness to testify, the movant must show that the witness would have testified if called, and that the witness's testimony would have aided the movant's defense.'" *Honeycutt v. State*, 54 S.W.3d 633, 645 (Mo.App. W.D.2001) (quoting *Hatcher*, 4 S.W.3d at 150).

In making his claim, Appellant's post-conviction motion extensively addressed the elements required to warrant an evidentiary hearing. Appellant's post-conviction motion clearly established that Dr. Willing could be and had been located by counsel and set out in detail what she would have testified about if called. Appellant averred that defense counsel had retained Dr. Willing to interpret the raw MMPI data from the test administered by the State's doctors, that they were aware of how to locate her and that she would testify that she had been available and willing to testify at trial. The motion further asserted that Dr. Willing's testimony would "rebut and undermine" Dr. Vlach's testimony by demonstrating that Dr. Vlach and Dr. Jackson had "substantially misrepresented" the meaning of Wainwright's MMPI–2 profile and his state of mental health, and that Dr. Willing would testify that "Dr. Jackson's interpretation was not only 'substandard,' but was a 'misrepresentation of [Appellant]'s psychological state and mental condition.'" Appellant further alleged that Dr. Willing would have testified that "the MMPI–2 is a 'standardized' personality test, the interpretation of which is regulated by state 'ethical codes and guidelines,'" that there should be little variation in interpretation from one psychologist to the next, and that the results of the test are not valid if the standard interpretation procedures are not followed.

The motion went on to assert that Dr. Willing would testify that several of his scores were "elevated," indicating that he was suffering from psychological distress, that the standard procedures called for further interpretive analysis under those circumstances, and that further analysis revealed that Appellant suffered from long-term psychological distress rather than situational distress as opined in Dr. Jackson's report. Appellant submitted that, "[i]n short, Dr. Willing will testify that Dr. Jackson's report is not a 'fair and accurate report of what the MMPI–2 profile actually stated,' because Dr. Jackson's interpretation was not a 'standardized' or and 'objective' interpretation. Rather it was an 'anomaly' that 'departed from the standardized interpretation process.'" Appellant then averred that trial counsel should have presented that testimony of Dr. Willing to support counsels' efforts to exclude Dr. Vlach's testimony about the MMPI–2 testing and, once Dr. Vlach had testified about the MMPI–2 testing and how it supported his hypothesis about Appellant, counsel should have presented Dr. Willing's testimony to impeach the testimony of Dr. Vlach. Appellant argued that, if this had been done, Dr. Vlach's testimony about the MMPI–2 would have been excluded or, at least, impeached, thereby undermining the jury's confidence in Dr. Vlach's opinion that Appellant did not suffer from a mental disease or defect that would have interfered with his ability to deliberate. Finally, Appellant asserted that trial counsel would testify that they were aware of what Dr. Willing's testimony would have been, that Dr. Willing's testimony should have been used in support of the motion in limine and the trial objections to Dr. Vlach's testimony about the MMPI–2, and that they should have used Dr. Willing's testimony to impeach the testimony of Dr. Vlach.

In denying Appellant's post-conviction motion without an evidentiary hear-

ing, the motion court noted that Appellant had presented the testimony of four other experts to establish his defense that he had a mental disease or defect that prevented him from deliberating. The motion court further noted that Dr. Dorothy Lewis, one of those experts, had expressed some reservations about the MMPI–2 conducted by Dr. Vlach and Dr. Jackson and found that Dr. Willing's testimony would, therefore, have merely been cumulative to the testimony already presented at trial.

■ Certainly, the failure to present cumulative evidence generally does not constitute ineffective assistance of counsel. *Winfield v. State*, 93 S.W.3d 732, 740 (Mo. banc 2002). Having reviewed the testimony of the various experts at trial, however, it is clear that the testimony that Appellant proposed to offer from Dr. Willing was not cumulative to that testimony.

The only one of Appellant's experts to reference the MMPI–2 was Dr. Lewis, and her testimony about the MMPI–2 was very limited. She testified that she had Dr. Willing reinterpret the raw data from the MMPI–2 performed by Dr. Jackson because she thought "there was something peculiar about the way it had been interpreted." Dr. Lewis testified that she did not believe the MMPI–2 taken by Appellant provided a valid profile. She then testified:

> When the data was computer interpreted, not just interpreted clinically, the response was that "Clinical patients with this validity profile are often confused and distractible and have memory problems. Evidence of delusions and thought disorder may be present. He may be exhibiting a high degree of distress and personality deterioration. Confused, disorganized, and intensely anxious, he is over ideational and obsessed with strange thoughts and feel-

ings of inadequacy." I don't understand their interpretation of the MMPI.

Dr. Lewis then indicated that the computer-generated interpretation provided by Dr. Willing was consistent with her diagnosis.

Appellant's pleadings reflect that Dr. Willing would offer testimony that addresses issues not covered in Dr. Lewis' testimony and would, therefore, not be cumulative to Dr. Lewis' testimony. According to Appellant's motion, Dr. Willing would testify that the scoring methods utilized by Dr. Jackson and accepted by Dr. Vlach did not comply with the established standards recognized by the profession. Dr. Willing would have testified that the MMPI–2 is a standardized personality test that has established guidelines and ethical codes governing its interpretation and that there should be little variation in interpretation from one psychologist to the next. Dr. Willing would further testify that Dr. Jackson and Dr. Vlach had "substantially misrepresented" the meaning of Appellant's MMPI–2 profile and his state of mental health. According to Appellant's motion, Dr. Willing would also have gone into greater detail on the results of the MMPI–2 and what they indicated about Appellant's mental condition.

The aforementioned testimony of Dr. Willing would clearly go beyond the testimony of Dr. Lewis that "there was something peculiar about the way [the MMPI–2] had been interpreted" by Dr. Jackson and that she did not understand the interpretation of Dr. Jackson and Dr. Vlach. Indeed, Dr. Lewis' testimony makes no mention of the fact that the scoring of the MMPI–2 is standardized and governed by specific guidelines or the fact that Dr. Jackson and Dr. Vlach disregarded those guidelines in interpreting Appellant's MMPI–2 data. Accordingly, Dr. Willing's testimony was not cumulative of Dr. Lew-

is', and the motion court clearly erred in so finding.

■ We next consider whether Appellant's motion sufficiently established prejudice resulting from counsel's failure to call Dr. Willing to testify at trial. "Prejudice is shown when the movant establishes 'a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.'" *Kuehne,* 107 S.W.3d at 292 (quoting *State v. Hall,* 982 S.W.2d 675, 680 (Mo. banc 1998)).

In attempting to rebut Appellant's evidence that a mental disease or defect prevented him from deliberating at the time of the crime, the State relied entirely upon the testimony of Dr. Vlach and the report he authored in collaboration with Dr. Jackson. The testimony that Appellant claims Dr. Willing would have provided would have served to impeach that evidence.

■ " 'The purpose of impeachment is to impair or destroy a witness's credibility or render questionable the truth of his particular testimony. Because the jury is to assess credibility, it is entitled to any information which might bear significantly on the veracity of a witness.'" *Id.* at 294 (quoting *State v. Russell,* 625 S.W.2d 138, 141 (Mo. banc 1981)). "In addition, '[a]nything that has the legitimate tendency to throw light on the "accuracy, truthfulness, and sincerity of a witness is proper for determining the credibility of the witness." '" *Id.* (quoting *State v. Hahn,* 37 S.W.3d 344, 355 (Mo.App. W.D.2000)).

If found credible, Dr. Willing's testimony would impeach the credibility of Dr. Vlach and his diagnosis. Where the decision of the jury rested solely upon the credibility of the State's witness, the absence of an impeaching witness's testimony serves to prejudice the defendant. *Id.* at 295. Appellant sufficiently asserted that there is a reasonable probability that the

results of the trial would have been different if Dr. Willing had testified about Dr. Vlach's misrepresentations regarding the results of Appellant's MMPI–2 and the jury found that testimony to be credible. Therefore, Appellant alleged sufficient facts to entitle him to an evidentiary hearing on whether trial counsel was ineffective for failing to call Dr. Willing to testify. *See Id.*

The motion court clearly erred in failing to conduct an evidentiary hearing on Appellant's post-conviction motion. As the record does not conclusively establish that Appellant was not entitled to relief, *Ringo,* 120 S.W.3d at 745, an evidentiary hearing was required to evaluate Appellant's claims and the testimony of Dr. Willing and trial counsel. Accordingly, the motion court's denial of Appellant's post-conviction motion is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

All concur.