

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| **ANTONIO C. JACKSON,** | ) | |
| | ) | |
| **Appellant,** | ) | **WD84387** |
| | ) | |
| **v.** | ) | **OPINION FILED:  July 12, 2022** |
| | ) | |
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable John M. Torrence, Judge

Before Division Three:  Gary D. Witt, Presiding Judge, Anthony Rex Gabbert, Judge and
W. Douglas Thomson, Judge

Antonio Jackson ("Jackson") appeals the judgment of the Circuit Court of Jackson County ("motion court"), following an evidentiary hearing, denying Jackson's amended motion to vacate, set aside, or correct the judgment and sentence, pursuant to Rule 29.15.[1] On appeal, Jackson argues the motion court erred in denying his amended motion because (1) Jackson's trial counsel was ineffective in advising him to waive a jury trial due to potential federal charges, which rendered Jackson's waiver not knowing, voluntary, and

---

[1] All rule references are to Missouri Supreme Court Rules (2020), unless otherwise indicated.

intelligent; and (2) Jackson's trial counsel was ineffective in failing to request Dr. Witcher perform a complete mental evaluation of Jackson and then failing to call Dr. Witcher as a witness during sentencing to explain how Jackson's intellectual disability influenced his criminality. Finding no error, we affirm.

## Factual Background

Jackson was convicted, following a bench trial, for the events that occurred on or about December 3, 2011. The evidence presented at the bench trial showed that Jackson approached two women at gunpoint near their vehicle in downtown Kansas City around midnight as they were leaving a bar. Jackson took the victims' purses, and when he saw they were empty, he ordered the victims to drive him to an ATM. Jackson sat in the backseat as one victim drove and the other victim sat in the front seat. As they began to drive, a friend of the victims pulled up next to them and sensed something was wrong. The friend followed the victims in his vehicle and called police. Jackson ordered the victims to take him to an ATM on 31st street, which was about twenty blocks from where he initially encountered them. The victim driving the car retrieved three hundred dollars from the ATM and handed it to Jackson. Jackson ordered the victims to bring him back downtown to the location where he initially approached them. While driving toward downtown, police officers surrounded the victims' car and arrested Jackson.

Jackson was charged by indictment with robbery in the first degree, two counts of kidnapping and three counts of armed criminal action. Jackson was appointed counsel. Shortly before the case was set for jury trial, the State offered that if Jackson waived a jury trial and agreed to a bench trial, the State would agree, if Jackson were convicted at trial,

2

to a maximum sentence of 25 years in the Department of Corrections. Trial counsel advised Jackson to waive a jury trial pursuant to this agreement. Jackson signed a written waiver of a jury trial. Trial counsel also stated on the record that the agreement to waive a jury trial was "in conjunction with an agreement with the State that Mr. Jackson would only be subject to a range of sentencing up to 25 years and no more at the time of sentencing, if he were to be convicted." The trial judge stated, "I will go ahead then and sign off on this waiver and we will proceed with a bench trial."

Following the bench trial, Jackson was convicted of all six counts. The trial court found Jackson to be a prior offender and a prior/persistent offender pursuant to sections 558.016[2] and 557.036. The trial court sentenced Jackson to concurrent terms of imprisonment of twenty years for robbery, fifteen years for each count of kidnapping, and twenty years for each count of armed criminal action. The judgment of conviction was affirmed by this Court in a per curiam order. *State v. Jackson*, 470 S.W.3d 387 (Mo. App. W.D. 2015).

Jackson filed a timely motion to vacate, set aside, or correct the judgment under Rule 29.15, and appointed counsel timely filed an amended motion. The motion court held an evidentiary hearing, and Jackson's trial counsel was the sole witness. The motion court issued findings of fact, conclusions of law, and judgment denying Jackson's amended motion. This appeal follows.

---

[2] All statutory references are to the Revised Statutes of Missouri (Cum. Supp. 2011), unless otherwise indicated.

3

## Standard of Review

Appellate review of the motion court's judgment under Rule 29.15 is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. *Price v. State*, 422 S.W.3d 292, 294 (Mo. banc 2014); Rule 29.15(k). "Findings and conclusions are clearly erroneous only if a full review of the record definitely and firmly reveals that a mistake has been made." *King v. State*, 638 S.W.3d 113, 117 (Mo. App. W.D. 2022) (quoting *Morrow v. State*, 21 S.W.3d 819, 822 (Mo. banc 2000)). "It is incumbent upon the movant in a post-conviction motion to prove his claims for relief by a preponderance of the evidence." *Dishmon v. State*, 248 S.W.3d 656, 660 (Mo. App. S.D. 2008); Rule 29.15(i).

## Analysis

"To be entitled to post-conviction relief for ineffective assistance of counsel, the movant must satisfy the two-pronged *Strickland* test." *Jindra v. State*, 580 S.W.3d 635, 641 (Mo. App. W.D. 2019); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "First, the movant must show counsel failed to perform to the degree of skill, care, and diligence that a reasonably competent attorney would under similar circumstances." *Lindsey v. State*, 633 S.W.3d 547, 551 (Mo. App. W.D. 2021). This requires that the movant show that counsel's representation "fell below an objective standard of reasonableness." *Jindra*, 580 S.W.3d at 641; *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. The movant must then show that he was prejudiced by this failure. *Jindra*, 580 S.W.3d at 641. "Prejudice occurs when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

4

*Id.* (quoting *Johnson v. State*, 406 S.W.3d 892, 899 (Mo. banc 2013)). "A movant must overcome the strong presumption that counsel's conduct was reasonable and effective." *Id.* "To overcome this presumption, a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* (internal quotations omitted). "Trial strategy decisions may be a basis for ineffective counsel only if that decision was unreasonable." *Id.*

**Point I**

Jackson argues trial counsel's conduct fell below an objective level of reasonableness because he recommended Jackson waive a jury trial due to potential federal charges. Both the United States Constitution and the Missouri Constitution guarantee a defendant in a criminal case the right to a jury trial. U.S. Const. Amend. VI; Mo. Const. Art. I, section 22(a). "[I]n every criminal case any defendant may, with the assent of the court, waive a jury trial and submit the trial of such case to the court, whose finding shall have the force and effect of a verdict of a jury." Mo. Const. Art. I, section 22(a); Rule 27.01(b).

In Jackson's first point, he argues his waiver of a jury trial was not made knowingly, intelligently, and voluntarily because trial counsel advised him to waive the jury trial to potentially avoid federal gun charges, such as a felon in possession of a firearm ("FIP"). Trial counsel had approximately 20 years of experience in the Public Defender's Office with over 12 of those serving as a trial team leader. At the evidentiary hearing, trial counsel testified that, in his experience, the federal prosecutor is less likely to charge a defendant

5

with gun charges if some agreement was entered into with the State regarding the disposition of the case.

> And I may have also thought and may have conveyed to him that by entering into an agreement with the State that it might reduce the chances of a federal prosecution, just because in my experience that when cases are resolved with some agreement with the State, even though it is not an actual plea agreement but one where the State agreed to a lid, I think I might have told Mr. Jackson that I thought that the chances were reduced somewhat of a federal intervention for an FIP.

Trial counsel also testified he was concerned that Jackson may have wanted to testify in front of a jury.

> [I]f [Jackson] testified he was maybe going to make an admission or would have made an admission concerning the firearm, which concerned me about the possibility of federal prosecution for felon in possession of a firearm if he made that admission. And I believe that was a factor in our discussion about it.

Jackson relies on this testimony to argue trial counsel was ineffective because an agreement to waive a jury trial would not impact a federal prosecutor's decision to charge Jackson with an FIP. According to Jackson, "Counsel's concern that Mr. Jackson's testimony may feature perjury[3] has no legal connection with a potential federal felon in possession charge or waiving jury trial. It was bad advice, and it is reversible." However, this ignores other testimony from trial counsel at the evidentiary hearing that, in trial counsel's opinion, a bench trial was more favorable to Jackson than a jury trial. Trial counsel testified, "In this case I think that the main consideration was that I thought the

---

[3] Although Jackson argues here that trial counsel was concerned with Jackson committing perjury, our reading of trial counsel's testimony at the evidentiary hearing shows trial counsel was concerned with Jackson making an admission during trial regarding his possession of the firearm, not perjurious statements, that could later be used against him in connection with federal charges.

6

nature of the defense that we were going to put on was one that I thought would have a better chance with Judge Torrence than with a jury." Further, trial counsel stated:

> The other factor was truthfully, I just thought that Mr. Jackson's chances with the defense we were putting on wouldn't be good with a jury because it all relied on us creating an inference based on the fact that the alleged money from the ATM was not found on Mr. Jackson at the time that the original arrest occurred, in the original searches in detention. It was not allegedly found until 14 or 15 hours later at the jail.
>
> The inference there involved a whole chain of circumstances that led to the inference that Mr. Jackson never actually had possession of the cash from the ATM, which was to impeach the credibility of the two victims, the nurses. And I thought those two witnesses were going to be very credible to a jury and that they would just start off with -- I just assumed, and think it is a valid assumption that had they appeared in front of a jury and we tried to use that inferential attack on them that it would just have no chance.
>
> Whereas, I thought with Judge Torrence not necessarily being overawed by the status of these witnesses, these nice ladies from the hospital, that maybe this series of very strange circumstances involving dereliction by the police, according to their own testimony, might at least give Judge Torrence pause as to whether all those circumstances are really what they appeared to be.

Throughout Jackson's argument he ignores the fact that the State agreed in exchange for his agreement to waive a jury trial, to a maximum of 25 years on any sentence he would receive, in the event Jackson were convicted of any of the charges. Based on Jackson's criminal history and the nature of the charges against him this agreement for a maximum term of years at sentencing was an important consideration. Jackson also ignores that trial counsel testified that based on his experience (over 20 years in the Public Defender's Office) if an agreement such as this were entered into with the State, it would reduce the chances that the federal prosecutor would later bring FIP charges against Jackson. This was another important consideration in the agreement to waive a jury trial.

7

Trial counsel's advice to Jackson to waive a jury trial was reasonable and sound trial strategy. In addition to the consideration of the maximum sentence and the potential effect the agreement with the state may have on potential federal charges, our cases are clear that trial attorneys exercise reasonable trial strategy when considering the way potential jurors may be sympathetic to victim testimony or the way in which jurors perceive defendants with a criminal history. *See Smith v. State*, 837 S.W.2d 25, 27-28 (Mo. App. W.D. 1992); *Dorsey v. State*, 113 S.W.3d 311, 315 (Mo. App. S.D. 2003); *Dishmon*, 248 S.W.3d at 662 ("Trial counsel explained to Movant that it was important to understand that most jurors (unlike judges) have little contact with felons, and that, accordingly, they can 'have difficulty understanding a criminal defendant.'"). Here, given the nature of the charged offenses, trial counsel considered the effect that two sympathetic victims' testimonies would have on the jury. Similar to *Smith*, in which the defendant's trial attorney advised that "a jury's sympathy would naturally side with a young victim, whom they would more likely believe," 837 S.W.2d at 27-28, Jackson's trial counsel believed that the female victims whom Jackson robbed and kidnapped would be sympathetic victims in the eyes of a jury. Trial counsel also testified that, given the defense's "complex" legal theory of the case, he concluded a judge sitting as the trier of fact could more impartially follow the chain of inferences presented by the defense; thus, trial counsel concluded a bench trial was more favorable to Jackson. This was also reasonable trial strategy, and the motion court's judgment was not clearly erroneous in denying Jackson's amended motion. Therefore, trial counsel's conduct did not fall below an objective level of reasonableness,

8

and we need not analyze the prejudice prong of the *Strickland* standard. *See State v. Simmons*, 955 S.W.2d 729, 746 (Mo. banc 1997).

Jackson also argues that the waiver of a jury trial was not knowing, voluntary, and intelligent because "Mr. Jackson's written waiver is bare and no record was made regarding his actual knowledge, voluntariness and intelligence." Jackson raises this issue in the argument section of his brief, but he did not raise this issue in his amended motion or in a point relied on on appeal. Therefore Jackson has waived this argument and we need not address it. *See Day v. State*, 495 S.W.3d 773, 776 (Mo. App. S.D. 2016); Rule 84.04(e). However, even if it had been preserved for appeal, Jackson's argument would fail. "The defendant may, with the assent of the court, waive a trial by jury and submit the trial of any criminal case to the court, whose findings shall have the force and effect of the verdict of a jury. In felony cases such wavier by the defendant shall be made in open court and entered of record." Rule 27.01(b). Rule 27.01 only requires that a waiver of a jury trial be made in open court. *State v. Moore*, 414 S.W.3d 580, 584 (Mo. App. W.D. 2013).

Here, Jackson signed the written waiver, which was presented to the trial judge in open court. Further, at the evidentiary hearing, trial counsel also stated that he met with Jackson two or three times to discuss the strategy behind waiving a jury trial before having Jackson sign the waiver form. Accordingly, it is clear from the record that trial counsel advised Jackson about waiving a jury trial and the waiver form was presented in open court. This complies with Rule 27.01(b).

Point one is denied.

**Point II**

Jackson's second point on appeal argues trial counsel's conduct fell below an objective level of reasonableness because trial counsel failed to request Dr. Witcher perform a complete mental evaluation of Jackson and then failed to call Dr. Witcher as an expert witness during sentencing to explain how the defendant's intellectual disability influenced his criminality. Although Dr. Witcher evaluated Jackson and authored a written report that was admitted as an exhibit during sentencing, Jackson argues trial counsel was ineffective in failing to request Dr. Witcher perform a complete mental evaluation of Jackson. During sentencing, the trial court emphasized Jackson's recent recidivism in determining the sentence; that is, Jackson committed the charged offenses exactly two weeks after being paroled from prison for a similar robbery offense. According to Jackson, a complete evaluation conducted by Dr. Witcher would have allowed Dr. Witcher to expound upon Jackson's intellectual disability and give a diagnosis to a reasonable degree of psychological certainty in order to explain Jackson's behavior and inability to conform his behavior to societal norms and not reoffend. Dr. Witcher's report that was used at sentencing showed that Jackson had an IQ of 60, which is a significant intellectual disability in the very low range of functioning.

As noted, to sustain his burden to prove that he received ineffective assistance of counsel, Jackson "must prove by a preponderance of the evidence that: (1) counsel failed to exercise the level of skill and diligence of a reasonably competent attorney; and (2) that he was thereby prejudiced." *Dunlap v. State*, 452 S.W.3d 257, 262 (Mo. App. W.D. 2015). "Applied to claims of ineffective assistance of counsel at sentencing, a movant must show

10

that but for sentencing counsel's errors . . . the result of the sentencing would have been different, specifically, that his sentence would have been lower." *Jones v. State*, 541 S.W.3d 694, 697 (Mo. App. W.D. 2018) (internal quotations omitted). "To succeed on a claim of ineffective assistance of counsel for failure to call a witness, [Jackson] must show that: (1) counsel knew or should have known of the existence of the witness, (2) the witness could be located through a reasonable investigation, (3) the witness would testify, and (4) the testimony of the witness would have produced a viable defense." *Hays v. State*, 360 S.W.3d 304, 309-10 (Mo. App. W.D. 2012). Counsel's decision whether to call a witness to testify at sentencing as a matter of trial strategy is "virtually unchallengeable" on appeal. *Eichelberger v. State*, 134 S.W.3d 790, 793 (Mo. App. W.D. 2004).

Here, trial counsel's decision to not request a full mental evaluation of Jackson did not fall below an objective level of reasonableness. Trial counsel testified he offered a written report from Dr. Witcher at sentencing "to remind the Court about the history of Mr. Jackson's mental progress from the point of being incompetent and have an extensive history prior to this offense of mental illness[.]" Dr. Witcher's report stated Jackson produced a full-scale intelligence quotient (IQ) of 60, "which is in the very low/impaired range of functioning." The report also details that, in 2012, "Mr. Jackson was committed to Fulton State Hospital as Incompetent to Proceed. Upon admission he was diagnosed with Psychotic Disorder, Not Otherwise Specified due to such symptoms as persecutorial ideations and auditory hallucinations; he also received a diagnosis of Mild Mental

11

Retardation ("MMR")."[4] Although Jackson was previously diagnosed with MMR, Dr. Witcher concluded that "[c]ollateral information would be necessary to determine a diagnosis of [MMR]; however, testing clearly indicates his cognitive functioning is impaired." Finally, Dr. Witcher stated, "There were no signs or symptoms of mental disease or defect present that would impair [Jackson's] ability to be sentenced."

The motion court found that "[a]ll parties and the Court were aware of [Jackson's] mental and criminal history at the time of sentencing. Moreover, trial counsel provided a written report by Dr. Witcher at the sentencing hearing. The Court finds that the report contained the essential information regarding [Jackson's] intellectual and cognitive abilities[.]" Although Jackson argues a complete mental evaluation would have highlighted two or more adaptive deficits that accompany a diagnosis of Intellectual Disability, which could have then been considered by the trial court in determining a sentence in light of Jackson's recent recidivism, it is clear the trial court was already aware of Jackson's mental and criminal history at the time of sentencing. In other words, a complete mental evaluation would not have provided significant additional information to the trial court that it did not already have before it. And even if trial counsel's failure to request Dr. Witcher perform a complete mental evaluation fell below an objective level of competence, Jackson failed to show how he was prejudiced by that failure. Jackson merely notes, "The fact that the sentencing judge is left with the impression that a person with a

---

[4] Jackson's brief before this court notes Mild Mental Retardation is an outdated term for Jackson's diagnosis. The updated edition of the DSM-V has eliminated the term "retarded" and its variations and classifies Jackson's diagnosis as Intellectual Disability ("ID"). Both terms are referred to as they appear in the parties' briefing.

12

60 IQ still needs to spend twenty years in prison, and any information about the difficulties of being intellectually disabled -- for which he was on SSI for -- would help account for his recidivism is strong *per se* evidence of [trial counsel's] ineffectiveness." Jackson fails to show that, but for trial counsel's errors, the results of the sentencing would have been different, "specifically, that his sentence would have been lower." *See Jones*, 541 S.W.3d at 697. Indeed, the motion court (which was the same judge who sentenced Jackson) noted, "[A]ny additional evaluation would not have changed the outcome of the sentencing hearing." Moreover, as is the case here, "special deference is given when the [post-conviction relief] judge and the [sentencing] judge are the same." *Dowell v. State*, 615 S.W.3d 123, 127 (Mo. App. W.D. 2021). Accordingly, Jackson fails to satisfy either prong of the *Strickland* standard regarding trial counsel's decision to not request Dr. Witcher perform a complete mental evaluation.

As to Jackson's claim that failing to call Dr. Witcher as a witness during sentencing rendered Jackson's trial counsel ineffective, the record reflects trial counsel made a prudent decision to admit Dr. Witcher's report alone because it remained unclear whether her live testimony would benefit Jackson. Trial counsel noted it was unusual to not introduce an expert witness for live testimony, but he testified:

> [Dr. Witcher] expressed to me some kind of concern about how her presentation would come off or what she would say about Mr. Jackson's mental health issues if she were called as a witness. And I think because of that it then became necessary for me not to have her appear as a witness, but only to put together a very narrowly focused report or a written document that I could use to get the maximum benefit out of having her involved without what I guess must have been perceived between her and I as possible negative perception coming across from her.

13

Trial counsel's determination to not call Dr. Witcher as a witness at sentencing stemmed from his direct communication with the doctor and his concern that her testimony would not benefit Jackson. Therefore, to secure the "maximum benefit" from her expertise without subjecting Jackson to the potential negative consequences of her testimony, he opted to admit her written report. The trial court considered Dr. Witcher's written report, which contained "the essential information regarding [Jackson's] intellectual and cognitive abilities[.]" Trial counsel's decision to not call Dr. Witcher was prudent trial strategy, and his conduct did not fall below an objective level of reasonableness.

Point two is denied.

## Conclusion

For the foregoing reasons, the judgment of the motion court is affirmed.

_____
Gary D. Witt, Judge

All concur

14